Margaret KINZLI, Evelyn Goossen, Philip Kinzli, and Ernest Kinzli, Plaintiffs,

v.

CITY OF SANTA CRUZ, Defendant.

No. C–80–2863 MHP.

United States District Court, N. D. California.

April 21, 1982.

Jess S. Jackson, Burlingame, Cal., for plaintiffs.

Neal R. Anderson, Atchison & Anderson, Santa Cruz, Cal., for defendant.

## OPINION

PATEL, District Judge.

This case is presently before the court on the defendant's motion for summary judgment as to all claims. Section I summarizes the complaint, and the succeeding sections consider the defendant's challenges to various claims.

### I

### THE COMPLAINT

The central facts alleged in the amended complaint are as follows. The plaintiffs are Mrs. Margaret Kinzli, a 74-year-old widow, and her three children, Ernest and Philip Kinzli and Evelyn Goossen ("the Kinzlis"). The Kinzlis have for many years been the owners in fee simple of approximately 62 acres of essentially undeveloped land in the City and County of Santa Cruz.

The ownership of this property, on which Mrs. Kinzli and her late husband raised their children, is the chief product of their lifetime efforts. The land is presently uninhabited, and the only structural improvements are an outdated residence and some old barns, all of which have fallen into disuse. Since 1970 it has been surrounded by developed urban uses—including, on three sides, residential and commercial ones. It is, in its present state, economically nonproductive, and it cannot feasibly be put to agricultural or timber uses. At all times from 1970 to March 6, 1979, the period which is a principal focus of this action, the land was zoned to allow construction of seven dwelling units per acre, and it was the intention of the Kinzlis to develop most of this land for urban residential and commercial purposes.

Prior to 1970, the Kinzlis had owned more than their present 62 acres. But on August 14, 1968, Santa Cruz filed a state court condemnation action to acquire approximately four acres of their land for construction of a public street across the property. This street would have connected Broadway, on the west of the Kinzli property, with Brommer, on the east. Negotiations to arrive at a compromise settlement of the

condemnation action followed. During these negotiations, the city assured and promised Margaret Kinzli and her agents that it would construct the proposed Broadway-Brommer project "within a few years," that the project would provide ample direct access to the remaining Kinzli property, that the project would substantially benefit the remaining property by facilitating its development at a density of seven residential units per acre, and that the city would permit both residential and commercial development. In reliance on these assurances and promises and in consideration for them, the Kinzlis stipulated with the city to a judgment in the action which fixed the amount of compensation, and which incorporated as part of the agreement, among other things, the written plans containing the general construction design for the Broadway-Brommer project. This stipulated judgment was entered on May 18, 1970.

In the years following the 1970 stipulation and condemnation judgment, the city continued to represent to Margaret Kinzli that the project would be built. On October 5, 1978, it filed a second condemnation action to acquire an additional small piece of the Kinzli property, for the purpose of making a slight modification of the proposed project; but this second action was later abandoned. In reliance on the city's representations, the Kinzlis delayed development or sale of the property, waiting for the completion of the project. In the meantime, the land has not produced any economic return, nor has it been salable. To date, the project has not been commenced.

On March 6, 1979, the city enacted an initiative ordinance styled "City of Santa Cruz Measure O Greenbelt and Low Growth General Plan Policy Ordinance" (hereinafter "Measure O"). Subsequently, the Santa Cruz City Council enacted two ordinances the purpose of which was to implement Measure O: (1) Ordinance No. 79–9, adopted March 13, 1979, styled "An Ordinance of the City of Santa Cruz Imposing a Moratorium On the Division of Land, Zoning, Rezoning, or Prezoning, and On the Issuance of Building Permits On Certain 'Greenbelt' Lands In and Around the City of Santa Cruz and Declaring the Urgency Thereof," (hereinafter "the Moratorium Ordinance"), and (2) Ordinance No. 80–02, adopted January 22, 1980, styled "An Ordinance of the City of Santa Cruz Adding Chapter 24–53 To the Santa Cruz Municipal Code Establishing a Greenbelt Overlay District" (hereinafter "the Greenbelt Overlay Ordinance").

The effect of these measures, both facially and as applied to the Kinzli property, has been to restrict the uses to which it can be put. But none of the uses permitted the Kinzlis are viable economic uses; and the ordinances do not so restrict certain other undeveloped parcels within Santa Cruz. Since enacting these ordinances and, on December 13, 1979, abandoning the second Broadway-Brommer condemnation action, the city and its public officials have intentionally acted to prohibit all feasible private uses of the land, including development, and to maintain it permanently for the public use and benefit as unimproved open space without compensating the fee owners. On several occasions city officials warned the Kinzlis and prospective purchasers of the Kinzli land that no viable private development proposal would receive the city's approval, that any application to the city to improve the property would be futile, and that the city's staff would not even process such an application.

The foregoing summarizes the amended complaint's factual allegations. The claims based on these allegations are as follows. The plaintiffs' first, second, fourth, eighth, tenth, twelfth, and fourteenth claims purport to be based squarely on federal law, and the third, fifth, sixth, seventh, ninth, eleventh, thirteenth, fifteenth, sixteenth, and seventeenth claims all seem to arise from state law, although the legal basis of the seventh claim, discussed below, is ambiguous. The eighteenth and last claim is one for declaratory relief.

The federal law claims are brought directly under the due process, equal protection, and taking clauses of the fifth and fourteenth amendments to the United

States Constitution, and also under these same provisions through the Civil Rights Acts, principally 42 U.S.C. §§ 1983, 1985, and 1986. The pendent California law claims are based on equivalent provisions in the state constitution, on state law contract, estoppel, and unjust enrichment theories, on the 1970 judgment in the condemnation action, and on other state law provisions that the complaint does not identify. These causes of action will be discussed in greater detail below. The plaintiffs filed this action against the city on July 8, 1980, and the city has now moved for summary judgment, seeking a full resolution of all claims against it.

## II

### THE ORDINANCES

Measure O, "An Initiative Ordinance Exacting A Greenbelt And Low Growth General Plan Policy," was adopted by popular vote on March 6, 1979. Among its self-described purposes is "[t]o adopt certain policies as part of the General Plan of the City of Santa Cruz," and to require certain further revisions of the General Plan within nine months of the ordinance's effective date. *Id.* § 1. It sets forth "findings" which list the likely "adverse effects" of an expected "rapid rate of population and urban growth in the future." These effects include such things as traffic congestion and the degradation of the "scenic, historic, aesthetic, and environmental resources of the city." Id. § 2.

Measure O states that Santa Cruz "is presently substantially surrounded by 'Greenbelt' lands which provide scenic, aesthetic, environmental, and economic benefits to the citizens" of the city, and it defines "greenbelt land" as land which is essentially unimproved, and which is devoted to, or which may be devoted to, uses such as the following:

(1) Timber production and harvesting

(2) Agriculture, including grazing

(3) Private recreation

(4) Public recreation

(5) Wildlife habitat

(6) Watershed or groundwater recharge

(7) Scientific or educational purposes which maintain the open space character of the land

(8) Other uses which maintain the open space character of the land.

*Id.* § 3. It incorporates a map delineating the areas designated as greenbelt lands— areas which include the Kinzli property. It states a policy to limit population growth to an average of 1.4% per annum or the statewide average, whichever is greater. *Id.* § 4. And it declares a city policy to "preserve" the greenbelt lands

in greenbelt land uses, as specified in this ordinance, through the year 1990, and to that end, the City shall provide no additional urban services to said greenbelt lands, including water, sewer, and roads, and the City shall in all other possible ways consistent with this ordinance seek to preserve such lands in greenbelt land uses through the year 1990.

*Id.* Measure O also provides that no part of it "shall be amended or repealed except by a vote of the people." *Id.* § 8.

The Moratorium Ordinance, adopted by the city council shortly after the passage of Measure O, forbade the issuance of permits to build on the greenbelt lands (excepting only permits to remodel or restore existing buildings under very narrowly defined conditions), for a period of nine months, or until the city council adopted a general plan revision. It was followed approximately nine months later by the Greenbelt Overlay Ordinance, adopted by the city council on January 22, 1980, the "purpose and intent" of which, by its terms, "is to maintain essentially undeveloped lands surrounding existing urban development in uses that retain the land's physical characteristics and its potential for future development, until a time when expansion of urban development is necessary to provide for the residential and economic needs of the citizens of Santa Cruz." Santa Cruz Municipal Code ch. 24.-53, § 24.53.2000 (1981). This ordinance states that it is

intended that land uses allowed in the Greenbelt Overlay Zones will be both environmentally and visually compatible with the existing physical characteristics of the land, and permitted uses cannot have potential for significant effect on the environment in accordance with the definition contained in the California Environmental Quality Act (CEQA).

*Id.* It makes the following uses of greenbelt lands possible if a special use permit is obtained:

Timber production and harvesting

Agriculture, including grazing

Private recreational uses

Public recreational uses

Scientific or educational uses which maintain the open space character of the land

Single-family dwellings

Accessory buildings

Other uses which maintain the open space character of the land

*Id.* § 24.53.2010.[1] And it provides that any other use "may be allowed by special use permit" if it is "of the same general character as the foregoing uses" and if it conforms to the "purpose and intent of" the ordinance. *Id.* § 24.53.2020. "Urban services may be extended into the GBO [greenbelt overlay] zone only upon a finding that the use is consistent" with the ordinance, and subject to the approval of the city Department of Water and Department of Public Works. *Id.* § 24.53.2040. Unless amended or repealed, this Greenbelt Overlay Ordinance is to remain in effect until 1990.

This court also takes notice of the city's most recent General Plan, adopted January 8, 1980 by the city council, the map of which depicts the Kinzli property and several others as being devoted to "open space uses" in the year 1990.

## III

### THE CONSTITUTIONAL CLAIMS

The plaintiffs assert federal fifth amendment claims grounded on an alleged uncompensated taking of their property, as well as fourteenth amendment claims based upon the due process and equal protection clauses, both directly and through the medium of 42 U.S.C. § 1983 and related sections. The fourth and eighth claims, which are explicitly based directly on the federal due process and equal protection principles, will be taken up first.

 The amended complaint's fourth claim, which alleges that the land "has been arbitrarily, capriciously, unreasonably, and wrongfully restricted to preclude all viable economic use," and which claims violations of the plaintiffs' substantive and procedural due process rights, requires a more definite statement by the plaintiffs. To the extent that, in its present form, it purports to state a substantive due process claim grounded on the lack of a "substantial" or "rational" relationship to any legitimate police power objective, *see State of Washington ex rel. Seattle Title Trust Co. v. Roberge,* 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed.2d 210 (1928); *Construction Industry Association of Sonoma County v. City of Petaluma,* 522 F.2d 897 (1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976), summary judgment must be granted to the defendant, for the reasons suggested by *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). In *Agins* the Court concluded that an open-space ordinance—similar to, though arguably less restrictive than, those at issue here—substantially advanced a legitimate governmental goal: the protection of residents from the "ill effects of urbanization." *Id.* at 261, 100 S.Ct. at 2142. Ordinances which advance

---

**1.** The Greenbelt Overlay Ordinance, enacted by the city council after Measure O, adds "single-family dwellings" and "accessory buildings" to the .list of specific uses to which Measure O contemplates greenbelt lands will be limited. Measure O, an initiative ordinance, provides: "No part of this ordinance shall be amended or repealed, except by a vote of the people." *Id.* § 8. The plaintiffs contend, and the defendant has not presented argument to the contrary, that ordinances enacted by the city council after the enactment of Measure O are void to the extent that they effectively amend Measure O.

this goal by preventing the conversion of open-space land to urban uses are obviously not unrelated to a legitimate police power objective. *Id.* *See also Construction Industry Association of Sonoma County v. City of Petaluma, supra.* It is a separate question whether they achieve this objective, as the plaintiffs contend the Santa Cruz ordinances have done, by a means which violates the constitutional prohibition against the uncompensated taking of property. But to the extent that the fourth claim may be asserting a fifth amendment-based cause of action for an uncompensated taking by harsh regulation, it will be permitted to survive, for the reasons given below.

■ It is through the due process clause of the fourteenth amendment that the taking clause is made applicable to the states, *Webb's Fabulous Pharmacies v. Beckwith,* 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), and to cities, *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). In that sense, a due process claim can be a taking claim. In addition, the reference in the fourth claim to a deprivation of the plaintiffs' rights to *procedural* due process, though difficult to evaluate due to the absence of particularized factual allegations to clarify its meaning, survives, if only because the defendant has not specifically attacked it in its moving papers.

The eighth claim—which alleges that the city imposed on the use of the Kinzli property "arbitrary" and "unreasonable" limitations not imposed on the use of "surrounding" properties, in violation of the federal equal protection clause—also survives the defendant's motion. It is clear that the constitutional equal protection guarantee limits the power of cities to regulate the use of land. *Young v. American Mini Theatres,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). *See also Burns v. City of Des Peres,* 534 F.2d 103 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); *Palo Alto Tenants' Union v. Morgan,* 321 F.Supp. 908 (N.D.Cal.1970), *aff'd,* 487 F.2d 883 (9th Cir. 1973), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2608, 41 L.Ed.2d 214 (1974). An equal protection attack on zoning will typically focus on whether the differential treatment is rationally related to the advancement of some legitimate police power objective. *See, e.g., Stone v. City of Maitland,* 446 F.2d 83 (5th Cir. 1971). *See also Young v. American Mini Theatres,* 427 U.S. at 71–74, 96 S.Ct. at 2452–2454. When there is an allegation of so-called "spot zoning"—that is, discriminatory zoning that singles out a particular parcel (usually a small one) for treatment less favorable than that accorded surrounding properties—the inquiry is the same. *See, e.g., Viso v. State of California,* 92 Cal.App.3d 15, 23, 154 Cal. Rptr. 580, 585 (1979).

■■ Whether a zoning ordinance draws lines and subjects parcels of land to differential treatment in a way that fails to serve a legitimate governmental purpose is in part a factual question. In this case, the defendant has not brought to the court's attention affidavits or other evidentiary material that would suggest the absence of a genuine issue of material fact as to this question; and for that reason, its motion for summary judgment on the plaintiffs' federal equal protection claim will be denied. The suggestion in the defendant's reply brief that the differential treatment is justified by the fact that the properties are not similarly situated—the Kinzli land being open space land and the surrounding lots being built on—is to a degree logically circular. It is the very allegation that the city's actions have frozen development—and all other reasonable economic use—which constitute the basis of the federal constitutional claims in this case. Nor could it be maintained that the defendant is entitled to summary judgment on this claim because the failure to develop the property was, until the enactment of Measure O, the result of a voluntary decision by the Kinzlis. The complaint and the affidavit of Philip Kinzli state that until the enactment of Measure O he and his family were led by city officials to expect that the Broadway-Brommer project would be built, and reasonably anticipated development of the land after the project was completed. There-

fore, even if property otherwise similar to surrounding land could be regarded as "differently situated," for equal protection purposes, merely because its owners had not yet elected to develop it, summary judgment would not be appropriate where, as here, an issue of fact remains as to whether acts by the city or its officials induced the owners to refrain from development until the enactment of new ordinances made such development impossible.

■ Even though the defendant's motion for summary judgment will be denied as to the eighth claim, the plaintiffs must produce a more definite statement of the claim. In particular, the complaint must state facts sufficient to clarify the general allegation of "discriminatory" treatment.

The plaintiffs' second claim is brought directly under the fifth and fourteenth amendments to the federal constitution. It alleges a permanent, de facto uncompensated taking of their entire fee interest in the land, and seeks an award of monetary damages.

■ The fifth amendment, which is applicable to the states through the due process clause of the fourteenth, provides that private property shall not "be taken for public use, without just compensation." A general zoning ordinance, as it affects a particular piece of property, "effects a taking if the ordinance does not substantially advance legitimate state interests," or if it "denies an owner economically viable use of his land." *Agins v. City of Tiburon*, 447 U.S. at 260, 100 S.Ct. at 2141. As a matter of law, open space ordinances which discourage the conversion of undeveloped land to urban uses in order to protect residents from the ill effects of urbanization, substantially advance a legitimate state interest. *Id.* at 261, 100 S.Ct. at 2141. But it remains to determine whether the ordinances or actions complained of here deny the Kinzlis an "economically viable use" of their land.

■ As the Supreme Court has frequently observed, whether a particular restriction on the use of land effects an uncompensat-

ed taking depends largely upon the particular factual circumstances of each case. *Penn Central Transp. Co. v. New York City*, 438 U.S. at 124, 98 S.Ct. at 2659. Because such determinations require "essentially ad hoc, factual inquiries," *id.*, they are not ideally suited to resolution by summary judgment.

■ In deciding whether an open-space ordinance takes a particular piece of property, the court is told it is to engage in a case-by-case "weighing of private and public interests," *Agins v. City of Tiburon*, 447 U.S. at 261, 100 S.Ct. at 2141. A relevant factor is whether the plaintiffs must bear the burdens of the ordinance alone without reaping its benefits, or whether they "will share with other owners the benefits and burdens of the city's exercise of its police power." *Id.* at 262, 100 S.Ct. at 2142. The Court of Appeals for the Ninth Circuit has framed the question as "whether 'justice and fairness require that economic injuries caused by public action be compensated by the government rather than remain disproportionately concentrated on a few persons.'" *American Savings and Loan Ass'n v. County of Marin*, 653 F.2d 364, 371 (9th Cir. 1981) (quoting *Penn Central Transp. Co. v. New York City*, 438 U.S. at 124, 98 S.Ct. at 2659). It is therefore apparent that the taking determination is not as simple and mechanical as the bare language of the "economically viable use" test would seem, at first glance, to suggest.

■ Ordinances regulating the use of land may be attacked as enacted (that is, facially) or as applied. *Agins v. City of Tiburon*, 447 U.S. at 260, 100 S.Ct. at 2141. In an "as applied" challenge, an ordinance which might be inoffensive on its face is claimed to have been applied by public officials to a particular parcel in such a way as to produce an unconstitutional (in this case, confiscatory) result. What is being challenged, in other words, is the manner in which administrative officials have treated the plaintiffs under color of what might otherwise be an unexceptionable ordinance. *Cf. Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed.2d 220 (1886) (fourteenth amendment "as applied" challenge to racial discrimination). But whether the

ordinance is being attacked on its face or as applied, the taking inquiry requires that the trier of fact examine the precise *effect* of the terms of the ordinance or of its manner of application on the particular parcel of land at issue, in order to determine whether all viable economic uses have been precluded, and in order to establish whether the affected fee owner "will share with other owners the benefits and burdens of the city's exercise of its police power." [2]

■ If a public entity so substantially interferes with the use of private land as to effect a de facto taking, an action lies un-

der the fifth and fourteenth amendments to recover compensation on a theory of "inverse condemnation." *Richmond Elks Hall Association v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330 (9th Cir. 1977). *See also Hernandez v. City of Lafayette*, 643 F.2d 1188 (5th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982) (an action for monetary damages will lie under 42 U.S.C. § 1983 where land is taken through harsh zoning).[3] The plaintiffs' second claim seeks such compensation.

■ It is against this background that the defendant's motion for summary judg-

2. In *Hodel v. Virginia Surface Mining and Reclamation Association*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), the Court rejected a taking clause challenge to the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 et seq. As the Court noted, neither the coal producers who had attacked the statute nor the trial court had identified any particular property that had been taken. The Court began its analysis by pointing out that the "ad hoc factual inquiries" in which courts must engage in determining whether an exercise of the police power is confiscatory "must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances." *Id.* at 295, 101 S.Ct. at 2370. Accordingly, although it proceeded to examine the statute, it limited its consideration to the question whether its terms categorically prohibit any use of the lands to which it applies—a degree of scrutiny which the Act "easily survives." It concluded that a challenge to any other aspect of the operation of the statute could not be entertained in the posture in which the case came to the Court.

3. The United States Supreme Court has not squarely decided whether state or federal courts should entertain claims for monetary compensation, as opposed to equitable relief, in cases of taking by harsh regulation. In *Agins v. Tiburon*, 447 U.S. 255, 263, 100 S.Ct. 2138, 2142, 65 L.Ed.2d 106 (1980), and again in *San Diego Gas & Electric Co. v. City of San Diego*, 450 U.S. 621, 623, 101 S.Ct. 1287, 1289, 67 L.Ed.2d 551 (1981), the court explicitly left open the question whether state courts *must* provide a monetary remedy to a landowner in such cases, or whether they may limit available remedies to declaratory and injunctive relief. In *San Diego Gas & Electric Co.* the five-member majority concluded that it had to leave the issue undecided for want of jurisdiction, under the peculiar procedural circumstances of the case. The four dissenters, who would have reached the merits, concluded that the fifth

amendment requires a monetary remedy for de facto takings by police power regulation. Justice Rehnquist, concurring with the majority opinion, wrote separately and emphasized that he "would have little difficulty in agreeing with much of what is said in the dissenting opinion...," but that he disagreed with its conclusion that the Court had jurisdiction of the case. 450 U.S. at 633–34, 101 S.Ct. at 1294.

The matter of the proper measure of damages in such cases has been left undeveloped. The dissenters in *San Diego Gas & Electric Co.* proposed that "the government entity must pay just compensation for the period commencing on the date the regulation first effected the 'taking,' and ending on the date the government entity chooses to rescind or otherwise amend the regulation." *Id.* at 653, 101 S.Ct. at 1304 (Brennan, J.).

In *William C. Haas & Co. v. City and County of San Francisco*, 605 F.2d 1117 (9th Cir. 1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980), the court concluded that as a matter of law the zoning ordinance in question did not effect a taking of the plaintiff's land. It therefore had "no occasion to decide the correct measure of damages in an inverse condemnation action." *Id.* at 1120. Specifically, it did not reach the question whether, in addition to compensation for the alleged destruction of the market value of the land, the plaintiff might recover damages flowing from the city's frustration of the plaintiff's planned development. However, the same court suggests that under certain circumstances compensation may be appropriate. *American Savings and Loan Ass'n v. County of Marin*, 653 F.2d 364, 372 (9th Cir. 1981).

The plaintiffs have included in their second claim a demand for legal fees and other litigation costs. In *Richmond Elks Hall Association v. Richmond Redevelopment Agency*, 561 F.2d 1327 (9th Cir. 1977), the Court of Appeals held that there is no authorization for awards of litigation expenses to successful plaintiffs in inverse condemnation actions brought directly under the fifth and fourteenth amendments.

ment must be evaluated. The defendant contends that the Kinzli land remains undeveloped because it is less suitable than the rest of Santa Cruz for urban development. It asserts, for example, that the general plans of the city and the county identify this site as "highly erodable" and subject to "intense seismic hazards." The defendant also professes a concern for what it says is a "very important biotic community." Specifically, it fears for the welfare of "rare and endangered plants" which it says have been found on the site, such as Santa Cruz tar weed (Holocarpha macradenia). None of this, however, removes from the category of genuine disputed issues of material fact any of the questions upon which the constitutional issues will turn.

The central issues concern what uses, if any, remain to the plaintiffs after the enactment of the ordinances in question, and whether these uses are "viable economic" ones. As to this, each parcel of land poses a host of unique factual questions, none of which have been eliminated as a result of the relatively few affidavits presented in this case.

The defendant has suggested that Measure O may only be attacked facially because, as the plaintiffs admit, no development proposal for the property has been prepared and presented to the city. It is true that the Supreme Court in *Agins* declined to entertain a challenge to the constitutionality of the ways in which city officials might apply the ordinance—which authorized the city to permit between one and five single-family residences on the plaintiffs' five-acre tract—because no proposal had been submitted. The Court noted that absent such a development plan, there was "as yet no concrete controversy regarding the application of the specific zoning provisions. See *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588, 92 S.Ct. 1716, 1719, 32 L.Ed.2d 317 (1972). See also *Goldwater v. Carter*, 444 U.S. 996, 997, 100 S.Ct. 533, 534, 62 L.Ed.2d 428 (1979) (Powell, J., concurring)." 447 U.S. at 260, 100 S.Ct. at 2141.

As the language of *Agins* and the content of the cases it cites emphasize, the problem was one of ripeness. Until there *was* an application of the ordinance by city officials to the property in question, any challenge to the ordinance's possible manner of application would present a question too abstract and conjectural to be adjudicated. But if, as the plaintiffs have alleged, Santa Cruz officials have indicated that it would be futile, in view of Measure O and the related ordinances, to apply for private development of the plaintiffs' land, the problem of prematurity and abstractness is greatly lessened, if not eliminated. It should be noted in this regard that Measure O's command that "the City shall provide no additional urban services to said greenbelt lands including water, sewer, and roads, and the City shall in all other possible ways consistent with this ordinance seek to preserve such lands in greenbelt land uses through the year 1990" (§ 4) may not be amended or repealed except by popular vote (§ 8). If the facts as established at trial should show that the land can be put to no viable economic use without such services, then the futility of submitting for consideration by city officials proposals for development schemes that permit viable economic uses would be clear.

The defendant has spoken of the issue as one of "exhaustion of administrative remedies." This characterization would appear inapt. The question is not the narrow one of whether plaintiff should be required to pursue an administrative remedy, if there be one, before coming into court. Even so this does not alter the result, because even where strong policy reasons impel the courts to impose administrative exhaustion requirements, such exhaustion is not required "where the remedies are inadequate, inefficacious, or futile," or "where pursuit of them would irreparably injure the plaintiff." *United Farm Workers of America v. Arizona Agricultural Em-*

Whether the result would be different in inverse condemnation actions brought, as this one is, through the medium of 42 U.S.C.

§§ 1981 *et seq.* is an issue not raised by the parties at this stage of the proceedings. *See* 42 U.S.C. § 1988.

*ployment Relations Board,* 669 F.2d 1249, 1253 (9th Cir. 1982). And where constitutional claims are brought under 42 U.S.C. § 1983, this circuit has concluded that there is no general exhaustion requirement. *Morrison v. Jones,* 607 F.2d 1269, 1275 (9th Cir. 1979).

Should the Supreme Court adopt the more restrictive Fifth Circuit view as enunciated in *Patsy v. Florida International University,* 634 F.2d 900 (5th Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 88, 70 L.Ed.2d 81 (1981), it would make little difference here. The "remedies" available may be inadequate under the *Patsy* test since they may not be available within a reasonable period of time and may be unduly burdensome.

The jurisprudence of "taking," which is unique, is more analogous to the ripeness doctrine. *Compare Penn Central Transp. Co. v. New York City, supra, with Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–56, 87 S.Ct. 1507, 1515–19, 18 L.Ed.2d 681 (1967). It is more appropriate to look to that jurisprudence to determine whether the claim is ripe for adjudication. The teaching of *Penn Central* is that this is accomplished by "essentially ad hoc, factual inquiries," 438 U.S. at 124, 98 S.Ct. at 2659. This kind of analysis, using the *Penn Central* factors, was commended to the district court in *American Savings & Loan Ass'n v. County of Marin,* 653 F.2d 364, 371–72 (9th Cir. 1981).

 The plaintiffs have purported to state two other federal constitutional claims. One is that "Santa Cruz did not act in a fair and legitimate exercise of the power and discretion vested in it, but acted rather in an arbitrary, capricious and discriminatory abuse of such power and discretion, in violation of the Constitution and

laws of the United States." Plaintiffs' Twelfth Claim for Relief ("Abuse of Discretion—Federal Law"), Amended Complaint at ¶¶ 81–82. Without more particularized allegations to clarify its meaning, this claim is difficult to evaluate. But to the extent that it merely restates the federal due process and equal protection clause claims, it is to be subsumed in the analysis of the defendant's motions with respect to those claims. Similar considerations apply to the Fourteenth Claim ("Abuse of Discretion—Federal Law"), the allegations of which are substantially similar to those of the Twelfth.[4]

 The plaintiffs have also purported to state pendent claims for violation of the California Constitution. These are set forth in the third, fifth, ninth, thirteenth, and fifteenth claims of the complaint. If only because the defendant has not discussed these claims in its briefs, they will be permitted to survive. But the court notes that an aggrieved landowner may not presently obtain monetary relief for takings by means of harsh zoning, under California law. *Agins v. Tiburon,* 24 Cal.3d 266, 157 Cal.Rptr. 372, 598 P.2d 25 (1979), *aff'd on other grounds,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). The plaintiffs' third claim seeks compensation for the alleged taking under Article I, § 19 of the California Constitution.

## IV

## THE OTHER CLAIMS

### A. The Effect of the 1970 Judgment

 The plaintiffs' seventh claim, denominated "Action on Judgment," alleges that the May 18, 1970 judgment in the city's condemnation action obligated Santa Cruz to "promptly construct and complete" the

---

**4.** The defendant has contended that the plaintiffs' federal constitutional claims are barred by the statute of limitations. Constitutional claims brought, as these are, in California under 42 U.S.C. §§ 1981 *et seq.* are subject to the three-year limitation period provided by § 338(1) of the California Code of Civil Procedure. *Bratton v. Bethlehem Steel Corp.,* 649 F.2d 658 (9th Cir. 1980); *Jackson v. Hayakawa,*

605 F.2d 1121 (9th Cir. 1979), *cert. denied,* 445 U.S. 952, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). This action was filed on July 8, 1980. It remains an open question of fact when the plaintiffs' civil rights cause of action accrued. But clearly there is no bar to the action to the extent that it arises from the enactment of the ordinances in question.

Broadway-Brommer project, and to "provide reasonable access" to the Kinzli property. It also alleges that on December 13, 1979, the city "violated said judgment" by deciding not to complete the project. Amended Complaint at ¶¶ 66–67. To the extent that this claim merely seeks to enforce the terms of a judgment, it is barred by the ten-year limitations period provided for such actions by Cal.Civ.Proc.Code § 337.5(3), because this suit was filed on July 8, 1980.[5]

However, the seventh claim also alleges violations of the fifth and fourteenth amendments to the federal constitution, and of Article I, § 19 of the California Constitution. These allegations, and the contentions in the plaintiffs' brief, suggest that the seventh claim is intended to assert constitutional rights to just compensation for severance damages foregone by the plaintiffs when they stipulated to the 1970 judgment—the underlying premise of which, they assert, was that their property would benefit from, and its development value would be enhanced by, the expected completion of the Broadway-Brommer project.

Under the then-applicable statute, formerly Cal.Civ.Proc.Code § 1248(1), (2), and (3), the trier of fact was to ascertain the value of the condemned parcel and add to it the amount of the damages to the owner's remaining land arising from the fact of its severance from the condemned land. But from those severance damages would first be subtracted the value of any special benefits accruing to the owner's remaining land from the expected public project. Access to improved roads constitutes such a special

benefit. *City of Hayward v. Unger*, 194 Cal.App.2d 516, 15 Cal.Rptr. 301 (1961).

The stipulation and judgment in this case provided that the Kinzlis would receive "total just compensation" of $55,000.00 for the condemned parcel—an amount which included "the value of the property taken, together with severance damages." It incorporated engineering drawings of the proposed street to be constructed on the condemned land, and provided that the Kinzlis would "have the right to reasonable access to the road or street to be constructed on the property," as set forth in the drawings.

It is undisputed that the project has not been built. The plaintiffs now argue that the failure of the city to build the street entitles them to additional "constitutionally mandated compensation," because the anticipated special benefits which presumably reduced the amount of their severance damages have not materialized and, due to the enactment of Measure O, apparently will not do so in the reasonably near future. The plaintiffs have not attempted to present an argument that the federal constitution guarantees the right to sue after the fact for expected special benefits which did not arise, but rather have cited cases resting on state law.

There is authority, albeit in dicta, for the proposition that a change in the condemnor's project plans after the taking which results in greater-than-expected severance damages entitles the condemnee to sue to recover the difference between actual severance damages and those awarded in the condemnation action.[6] *People ex*

---

5. The limitation period begins to run not when the judgment is entered but rather when it is final. *Turner v. Donovan*, 52 Cal.App.2d 236, 126 P.2d 187, *cert. denied*, 317 U.S. 599, 63 S.Ct. 260, 87 L.Ed. 489 (1942). In the absence of an appeal, a judgment usually becomes final when the sixty-day period for filing an appeal has expired. 40 Cal.Jur.3d, *Judgments* § 4 at 333–34 (1978). If the judgment in the instant case had been appealable, it would have been final on July 17, 1970, and the action to enforce it would not have been barred by the 10-year limitations period. But the terms of the stipulation and judgment include an explicit waiver

of the right to appeal from the judgment. It would therefore be highly artificial to take into account the sixty-day appeal period in determining when the judgment became final.

6. 17 Cal.Jur.2d, Rev., *Eminent Domain* § 154 at 830–31 states the proposition as:

> A condemnation award is based on the assumption that the improvement will be carried out as proposed. If it is not, and if the changes result in detriment to the condemnee, he may bring a new action for such damages after they have occurred.

rel. Department of Public Works v. Ayon, 54 Cal.2d 217, 229, 5 Cal.Rptr. 151, 158, 352 P.2d 519, 526, cert. denied, 364 U.S. 827, 81 S.Ct. 65, 5 L.Ed.2d 55 (1960); People ex rel. Department of Public Works v. Pera, 190 Cal.App.2d 497, 502, 12 Cal.Rptr. 129, 131–32 (1961); People ex rel. Department of Public Works v. Schultz Co., 123 Cal.App.2d 925, 935–36, 268 P.2d 117, 124–25 (1954), disapproved on other grounds, People ex rel. Department of Public Works v. Chevalier, 52 Cal.2d 299, 340 P.2d 598 (1959); People v. Adamson, 118 Cal.App.2d 714, 722–23, 258 P.2d 1020, 1025–26 (1953). Because former § 1248(3) provides that the special benefits may only be used to offset the severance damages, rather than the compensation for the parcel taken, it follows that a condemnation judgment awarding such severance damages on the assumption that the project will be completed may be insufficient, under state law, when the expected special benefits which presumably have reduced those severance damages fail to materialize because the public project is not built. People ex rel. Department of Public Works v. Edgar, 219 Cal.App.2d 381, 389, 32 Cal.Rptr. 892, 897 (1963) (dictum). The plaintiffs may therefore proceed under state law on the seventh claim.[7]

### B. The Contract Claim

The sixth claim complains of the breach of a written contract—the 1970 stipulation—compromising the plaintiffs' rights in the condemnation action, in consideration of promises and representations of city officials that construction of the project was imminent, and that access to the new street would enhance the residential development value of their property.

 · A stipulation is, of course, a contract. 1 Witkin, California Procedure, Attorneys § 137 at 147 (2d ed. 1970). And a stipulated judgment "must be construed as any other contract." Rappenecker v. Sea-Land Service, Inc., 93 Cal.App.3d 256, 263, 155 Cal.Rptr. 516, 519 (1979). Except as otherwise provided by the California Civil Code, "[a]ll contracts, whether public or private, are to be interpreted by the same rules. . . ." Cal.Civ.Code § 1635. Thus, the rule that extrinsic evidence is admissible to resolve an ambiguity in a stipulated judgment, Ellena v. State of California, 69 Cal.App.3d 245, 259, 138 Cal.Rptr. 110, 118 (1977), Pinecrest Productions v. RKO Teleradio Pictures, 14 Cal.App.3d 6, 12, 92 Cal. Rptr. 44, 47–48 (1970), can be viewed as but a specific instance of the more general doctrine that extrinsic evidence is admissible to demonstrate that there is an ambiguity in a contract, and to resolve this ambiguity, La Count v. Hensel Phelps Construction Co., 79 Cal.App.3d 754, 770, 145 Cal.Rptr. 244, 253 (1978).

 Here, the stipulated judgment imposes certain obligations on both the city and the landowners beyond the payment of money and the taking of land. For example, the Kinzlis stipulated to erect barbed-wire cattle fencing along what would be the common boundaries of the condemned parcel and the remainder; and the city stipulated to provide certain drainage structures in the course of constructing the planned street. The "right to reasonable access to the road or street to be constructed on the property," as set forth in accompanying engineering drawings incorporated by reference, is guaranteed to the Kinzlis, subject only "to the normal exercise of the police power of the City of Santa Cruz to regulate the location and type of access to said road or street, and further, that such access granted to said defendants . . . shall be provided without cost or expense to the City. . . ."

The stipulation seems on its face to assume implicitly that the city would undertake to construct the street; and the plaintiffs have submitted the affidavit of Philip Kinzli, which, among other things, avers

---

7. The defendant's briefs contain some discussion of applicable statutes of limitation. However, it remains an open issue of fact as to when any cause of action arising from the failure to build the Broadway-Brommer project accrued. It is undisputed, however, that as late as 1978, the city initiated a second condemnation action to realign the proposed right of way across the Kinzli land.

that the plaintiffs' agreement to compromise their rights in the pending condemnation action was based upon their understanding, after meeting with city officials, that construction of the street would begin "soon," and that it would accelerate the property's development and enhance its value. This, at the least, raises a disputed issue of material fact as to whether the contract between the defendant and the plaintiffs should be construed to promise that the project would in fact be built, and that it would be built in such a way as to facilitate development of the Kinzli property.[8] The declarations and affidavits submitted by the defendant do not alter the issue's status as a disputed question of fact.

If the defendant contracted to build the project in such a way as to facilitate development, the time for performance—since none is specified in the stipulation—would, under contract principles, be a "reasonable time." Cal.Civ.Code § 1657. Measure O's terms now forbid the completion of the project until the year 1990. Under these circumstances, the defendant's motion for summary judgment as to the contract claims must be denied.[9]

### C. The Estoppel Claim

The sixteenth claim alleges that the Kinzlis, to their detriment, changed their positions in reliance on the promises and representations of city officials, presumably by stipulating to the judgment and by delaying the sale or development of their land. They contend that the city, in consequence, should be estopped from preventing development to a density of seven residential units per gross acre. This relief, the claim states, is sought only in the alternative, in the event that relief sought elsewhere in the complaint is not granted.

■ "Equitable" estoppel and promissory estoppel are both equitable doctrines, available only to avoid injustice. *See generally C & K Engineering Contractors v. Amber Steel Co.*, 23 Cal.3d 1, 151 Cal.Rptr. 323, 587 P.2d 1136 (1978); 1 Witkin, *Summary of California Law*, Contracts § 189 at 174–75 (8th ed. 1973) (promissory estoppel); *Strong v. County of Santa Cruz*, 15 Cal.3d 720, 125 Cal.Rptr. 896, 543 P.2d 264 (1975); 7 Witkin, *supra*, Equity § 131 at 5350–51 (8th ed. 1974) (equitable estoppel).

■ The doctrine of equitable estoppel "provides that a person may not deny

---

**8.** It has been said that "[a] contract made by a zoning authority to zone or to rezone or not to zone is illegal and the ordinance is void because a municipality may not surrender its governmental powers and functions or thus inhibit the exercise of its police or legislative powers." *State ex rel. Zupancic v. Schimenz*, 46 Wis.2d 22, 28, 174 N.W.2d 533, 537 (Wis.1970). But in the instant case, the complaint is not understood to state a claim that the defendant contracted not to rezone the land. Rather, the complaint may be understood to mean that it contracted to build a project that would facilitate development, and that it not only failed to build the project, but it enacted an ordinance— Measure O—which ensured that such a project could not be built within a reasonable time.

**9.** The defendant points out that when parties stipulate to a judgment the issues resolved by the judgment are, in general, *res judicata*, just as though they had been resolved through an adversary process. From this premise, it concludes that a stipulated judgment is a fully executed contract. In other words, "all contractual duties were fulfilled ... upon entry of the court's judgment," and "there is no contract to be performed." Defendant's Reply Brief at 21–22. But the authority defendant cites does not establish this "rule"; and it would be a *non sequitur* to leap from the fact of *res judicata* to the conclusion that the executory promises, if any, contained in the agreement were fully performed upon entry of the judgment.

The defendant also contends that the statute of limitations bars a contract claim. California law provides a four-year limitation period for actions on written contracts, Cal.Civ.Proc.Code § 337(1), counted from the time of the breach, *Carr v. New York Stock Exchange, Inc.*, 414 F.Supp. 1292, 1298 (N.D.Cal.1976); *Fox v. Dehn*, 42 Cal.App.3d 165, 173, 116 Cal.Rptr. 786, 791 (1974). Thus, the contract was breached, beginning the limitation period, after a reasonable time for performance had elapsed. It would be inappropriate on the present state of the record to fix the moment of breach. But it should be noted that the parties do not dispute that as late as 1978, a second condemnation action aimed at realigning the proposed roadway was instituted. And Philip Kinzli's affidavit claims that at least until late 1978, city officials stated to him and to the public and press that the project would be built.

the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment." *Strong v. County of Santa Cruz,* 15 Cal.3d at 725, 125 Cal.Rptr. at 898, 543 P.2d at 266. The four elements of equitable estoppel are that (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be relied upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely on the conduct to his injury. *Shamrock Development Co. v. City of Concord,* 656 F.2d 1380 (9th Cir. 1981); *Strong v. County of Santa Cruz,* 15 Cal.3d at 725, 125 Cal.Rptr. at 898, 543 P.2d at 266. Equitable estoppel may be applied against governmental entities, subject to the rule that "the doctrine is inapplicable if it would result in the nullification of a strong rule of policy adopted for the benefit of the public." *Id.* (citing *City of Long Beach v. Mansell,* 3 Cal.3d 462, 91 Cal.Rptr. 23, 476 P.2d 423 [1970]).

 The doctrine of promissory estoppel provides that "[a] promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *C & K Engineering Contractors v. Amber Steel Co.,* 23 Cal.3d at 6, 151 Cal. Rptr. at 325, 587 P.2d at 1138 (quoting and following Restatement, Contracts § 90 [10]). Like equitable estoppel, promissory estoppel may be applied against governmental entities. *Swinerton & Walberg Co. v. City of Inglewood-Los Angeles County Civic Center Authority,* 40 Cal.App.3d 98, 114 Cal.Rptr. 834 (1974). Enforcement of the promise is a possible remedy. Another is damages. *Id.; Hunter v. Hayes,* 533 P.2d 952, 954 (Colo.App.1975); 1A Corbin, *Contracts* § 200 at 221 (1963). *See also* Restatement Second, Contracts § 90. Although there

may be some question whether estoppel may be asserted to force a governmental entity to permit a landowner to build in a manner that is contrary to a zoning ordinance, *see Strong v. County of Santa Cruz,* 15 Cal.3d at 725, 125 Cal.Rptr. at 899, 543 P.2d at 267 (California Supreme Court did not reach the issue), a court of equity has broad powers to tailor remedies should plaintiffs prevail on this theory. *Hunter v. Hayes, supra.*

 Here, the same disputed questions of fact that preclude summary judgment as to the contract claim operate to preclude it as to the estoppel claim. Estoppel is very much a question of fact. *Mehl v. People ex rel. Department of Water and Power,* 13 Cal.3d 710, 715, 119 Cal.Rptr. 625, 532 P.2d 489 (1975). Although the present record overflows with argument, undisputed facts are relatively few—too few to establish that estoppel is inappropriate as a matter of law. Defendant has asserted the doctrine of laches as a bar to the estoppel claim. The plaintiffs can hardly be said to have slept on their rights if, as they aver, city officials made representations and took actions until late 1978 which generated a reasonable belief that the project would proceed.

## V

## CONCLUSION

The need for a Second Amended Complaint is obvious; and plaintiffs must amend. Many of their claims will have to be clarified by means of a more definite statement, or else excised. In particular, duplicative claims should be dropped; and claims such as the tenth and eighteenth, which merely specify a type of relief, should be consolidated into the prayer for relief. Summary judgment is denied except as provided below.

Summary judgment is granted as to the fourth claim, insofar as it purports to state a claim based on the lack of a substantial relationship between the city's ordinances

---

**10.** Restatement Second, Contracts § 90, published in 1981, adds this sentence: "The reme-

dy granted for breach may be limited as justice requires."

and a legitimate police power objective. But summary judgment is denied insofar as the fourth claim merely duplicates the second. All such duplications, however, should be consolidated in the next complaint.

Summary judgment is denied as to the fifth, eighth, ninth, twelfth, thirteenth, fourteenth, and fifteenth claims; but a sufficiently definite statement of these claims requires that plaintiffs add to their amended complaint additional clarifying allegations in conformity with this decision.

Summary judgment is granted as to the seventh claim, insofar as it merely seeks to enforce a judgment, or insofar as it might be understood to state a claim under federal law. But insofar as it states a claim under state law for additional severance damages, it may survive, provided it is clarified in accordance with this decision.

The motion is denied as to all other claims. For the purpose of this decision claims one and two are deemed to be one and the same. Plaintiffs should also clarify this in their amended complaint.

Plaintiffs shall file an amended complaint within thirty (30) days of the date of this order.