AMERICAN SAVINGS AND LOAN AS-SOCIATION, a California Corporation, Plaintiff-Appellant,

v.

COUNTY OF MARIN, a Public Entity et al., Defendants-Appellees.

No. 77–3703.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 18, 1980.

Reargued and Resubmitted Oct. 16, 1980.

Decided April 6, 1981.

Merrill, Circuit Judge, filed concurring and dissenting opinion.

Edmund L. Regalia, Miller, Starr & Regalia, Oakland, Cal., for plaintiff-appellant.

Douglas J. Maloney, San Rafael, Cal., for defendants-appellees.

Before MERRILL, SKOPIL and ALARCON, Circuit Judges.

SKOPIL, Circuit Judge:

Rehearing has been granted. The opinion filed on June 13, 1980 is withdrawn and is replaced by this opinion.

Appellant, American Savings & Loan, appeals from the district court's grant of summary judgment in favor of Marin County ("the County"). The broad issue presented is whether a county zoning ordinance effects an unconstitutional "taking" of appellant's land, a spit extending into San Francisco Bay. The spit is zoned to require very

low housing density. Appellant's contiguous land is zoned to allow a substantially higher density. In granting summary judgment, the trial court held that for "taking" purposes all of the plaintiff's contiguous land was to be considered as a single parcel. Because the zoning designations merely lowered the value of the parcel, there was no taking. We reverse and remand for further proceedings.

## FACTS

Appellant owns Strawberry Point ("the Point"), about 20 acres, and Strawberry Spit ("the Spit"), about 48 acres. They are contiguous. The Spit was the result of a landfill operation begun in 1953 by the appellant's predecessor in interest, Neider. In 1967 Berkeley Savings & Loan, appellant's predecessor in interest, acquired the Spit and the Point. Appellant entered into an option agreement with Eichler Homes. Eichler could develop and buy the property within two years. In 1965 Eichler declared bankruptcy, and development stopped. The bankruptcy court found appellant's agreement with Eichler resembled a mortgage more than an option. In 1973, at a bankruptcy sale, appellant purchased the land for $4,791,772.73 (less all principal amounts and interest appellant had previously expended for the property).

Meanwhile, the County was in the process of formulating a county-wide plan. In 1968 the City-County Planning Council recommended that the County acquire water-edge lowlands of Richardson Bay. The acquisition would include the Spit. In 1973 a citizen's group approved this approach in the Strawberry Community Plan. In January 1973 the Strawberry Park and Recreation District passed a resolution stating that it would "seek all means available to keep [the Spit] permanently and in public trust as open areas and research areas". In May 1973 the County Park, Recreation and Open Space Commission resolved that the Spit was "of Countywide significance as a Wildlife Preserve" and suggested that acquisition be considered. In August 1974 the County adopted a plan that incorporated this concept in general terms. Water-edged lowlands, including the Spit, were depicted on a map accompanying the plan as "urban open space".

On May 14, 1974 (before adoption of the County's plan) the County adopted zoning ordinance no. 2091 ("the ordinance"). The ordinance rezoned over 12,500 acres of ridge and upland greenbelt areas. The Spit was downzoned to allow one "multiple residential unit" per five acres. The Point was rezoned to allow four "multiple residential units" per acre.[1]

The planner who coordinated the process of drafting the ordinance said the lowered density on the Spit was due to "particular environmental problems or certain environmental concerns that would have to be met in development". The record shows that the Spit fill should subside over a forty-year period. Planners also felt the site would be particularly susceptible to tsunami (tidal waves). No specific studies were made of either possibility. The ordinance was based primarily on the earlier studies and recommendations of community and public groups. At the time the ordinance was adopted, no separate economic or traffic studies were made.

In August 1974 appellant filed a written claim with the County. Damages for inverse condemnation were claimed under Cal. Gov't Code § 900, *et seq.* The County rejected the claim. At no time did appellant seek approval for development of its land under the ordinance.

In November 1974 appellant filed suit in federal district court. It alleged that the ordinance was unconstitutional facially and as applied to the Spit and the Point. It requested the court to enjoin enforcement of the ordinance or to award damages for inverse condemnation.

1. The zoning history of the Spit is as follows: Originally: R–1 (single-family, 7,500 square foot lots) 8/29/67: RP–1–10 (single-family, 10,-000 square foot lots) 2/28/68: RSP–4 (no change in density).

After extensive discovery, the County moved for summary judgment. It contended that the Point and the Spit were legally a single parcel because they were contiguous, owned by the appellant, and intended for the same use. Because the Point retained monetary value (about $2 million), it suggested that the effect of the ordinance was merely to diminish the value of the parcel as a whole. This diminution in value was not an unconstitutional taking. The appellant maintained that the validity of the ordinance must be judged by the effect of a given zoning designation on a particular parcel. Because the Spit and the Point were zoned differently, the effect of the ordinance must be judged differently. Appellant contended that the Spit's zoning deprived it of any substantial beneficial use of the Spit and so was a taking.

Summary judgment for the County was orally granted, holding:

> "[W]here a single party has a single contiguous parcel of property affected by a community zoning program, and where that program permits a reasonable profitable use of the property taken as a whole, that no claim has been made for a [sic] unlawful taking ..."[2]

The trial judge did not consider whether the Spit itself would have a substantial beneficial use under its current zoning classification. Appellant appeals. We note jurisdiction under 28 U.S.C. § 1291.

## DISCUSSION

The district court held as a matter of law that the Spit and Point constitute a single parcel for taking purposes.

2. The court elaborated:

> Mr. Regalia: ... I point out that never has there been a common zoning ordinance applicable to these two parcels as a unit...
>
> The Court: I don't see that that has any significance at all. It very well may be that property in a single ownership has some part of it adjacent to a street that is zoned commercially and the rear part of it is zoned residentially. Does that make it two parcels of land?
>
> \* \* \* \* \* \*

### Single Parcel Theory

We begin by discussing the relationship between the taking issue and the severance damage issue in eminent domain proceedings. Government regulation can "be so onerous as to constitute a taking which constitutionally requires compensation". *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962). There is no set formula for determining when an economic injury occasioned by regulation must be compensated by government. *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). A police power regulation is not invalid simply because it prevents the highest and best use of the land. *Id.* at 125, 98 S.Ct. at 2659–2660; *Haas v. City & County of San Francisco*, 605 F.2d 1117, 1120 (9th Cir. 1979). Nor is a regulation invalid merely because it dramatically reduces the value of property. *E. g., Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (value reduced from $800,000 to $60,000). The validity of the ordinance must be judged "by focusing on the uses the regulations permit". *Penn Central*, 438 U.S. at 131, 98 S.Ct. at 2663. If the regulation is a valid exercise of the police power, it is not a taking if a reasonable use of the property remains. *See Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980).

The appellant conceded below that the Point had not been taken. The Point is still worth about $2 million and can be economically developed under current zoning. Nevertheless, the appellant maintains that there is no economically feasible use for the Spit, and so it has been taken. The County

> The problem is that the constitution doesn't protect parcels of land. The constitution protects the owner of land from an uncompensated taking and the owner is a single person. When you look at what is claimed to be the taking, you must look at the entire area of his affected ownership and we are dealing here with what, to all of the senses appears to be a single parcel of undeveloped land and the county or community plan for permitting development of it.
>
> Reporter's Transcript at 18.

contends that condemnation cases concerned with severance damages require us to treat the Spit and the Point as a single parcel. Under this single-parcel theory a reasonable use remains for the parcel as a whole (the Point plus the Spit) because a reasonable use remains for the Point.

■ Severance damages are awarded when government condemns only a portion of a larger parcel:

> "[W]hen part only of a parcel of land is taken for a highway, the value of that part is not the sole measure of the compensation or damages to be paid to the owner; but the incidental injury or benefit to the part not taken is also to be considered. When the part not taken is left in such shape of condition, as to be in itself of less value than before, the owner is entitled to additional damages on that account."

*Bauman v. Ross,* 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270 (1897). *See also United States v. 429.59 Acres,* 612 F.2d 459, 464 (9th Cir. 1980).

This rule applies only when the part taken and the remainder are together a single parcel. For severance damages purposes the criteria for determining property is a single parcel are: (1) physical contiguity; (2) unity of ownership; and (3) unity of use. *City of Los Angeles v. Wolfe,* 6 Cal.3d 326, 491 P.2d 813, 99 Cal.Rptr. 21 (1971); *People v. Thompson,* 43 Cal.2d 13, 271 P.2d 507 (1954); *Sharp v. United States,* 191 U.S. 341, 24 S.Ct. 114, 48 L.Ed. 211 (1903); 4A Sackman, *Nichols on Eminent Domain,* 1431, *et seq.* These criteria are not absolutely inflexible. They are working rules courts have adopted to do substantial justice in eminent domain proceedings. *United States v. Miller,* 317 U.S. 369, 375–76, 63 S.Ct. 276, 280–281, 87 L.Ed. 336 (1943); *United States v. 429.59 Acres,* 612 F.2d at 463–64.

■ The County acknowledges that these cases concern damages in condemnation actions. It suggests that "they are the only available judicial analysis of this issue and plaintiff is suing in inverse condemnation." We reject this suggestion. The issue is not the same in condemnation cases and in inverse condemnation cases. In condemnation cases the issue is damages: How much is due the landowner as just compensation? In inverse condemnation the issue is liability: Has the government's action effected a taking of the landowner's property? In the latter the boundaries of the property allegedly taken must be determined by taking jurisprudence rather than the law of eminent domain.

### Effect on Entire Parcel

We consider next whether taking jurisprudence supports the County's position. We have considered the cases cited by both parties and find none of them directly controlling. However, we find the County's position to be inconsistent with general principles governing taking questions.

The County cites *Multnomah County v. Howell,* 9 Or.App. 374, 496 P.2d 235 (1972), for its position that "the reasonableness of a zoning ordinance must be tested by its effect on the whole of the [landowner's] contiguous property, not simply on a portion thereof". 496 P.2d at 238. *Penn Central* uses similar language:

> " 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole ... "

438 U.S. 130–31, 98 S.Ct. at 2662.

Neither case involved the specific issue at stake here. In both cases the entire subject property was covered by a uniform restriction. In *Multnomah County v. Howell,* the plaintiff's thirteen acres were all zoned agricultural-residential. In *Penn Central,* the Landmarks Preservation Commission declined to permit a proposed building over the plaintiff's entire property. The challenged government action had not divided the property into discrete segments, and the

courts refused to do so. The question here is whether the challenged ordinance creates two separate parcels for taking purposes by adopting different zoning designations for each parcel.

■ The constitutionality of a zoning ordinance must be judged in part by the reasons supporting it. *See Goldblatt v. Town of Hempstead*, 369 U.S. at 594–95, 82 S.Ct. at 990; *Lawton v. Steele*, 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385 (1894).

■ As applied to a specific parcel of land, an ordinance may be judged by examining the reasons for placing the particular land in the particular zone. As the Supreme Court described it in *Euclid v. Ambler Realty Co.*:

> "It is true that when, if ever, the provisions set forth in the ordinance in tedious and minute detail, come to be concretely applied to particular premises, including those of the appellee, or to particular conditions, or to be considered in connection with specific complaints, some of them, or even many of them may be found to be clearly arbitrary and unreasonable."

272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926).

This case-by-case approach to judging the validity of zoning regulations on specific parcels of land is exemplified by *Nectow v. City of Cambridge*, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928). There a landowner owned a tract of 140,000 square feet. Of that, 29,000 square feet were zoned residential and the rest were unrestricted. The landowner contended the residentially zoned land had been taken. In judging the validity of the ordinance as a police power measure, the court considered the smaller tract separately from the larger tract.[3]

Similarly, in *Fifth Avenue Corp. v. Washington County*, 282 Or. 591, 581 P.2d 50 (1978), the plaintiff purchased twenty acres for development as a shopping center, a permissible use at the time of purchase. The defendant then adopted a comprehensive plan under which the twenty acres were divided into four separate zones: "residential", "neighborhood commercial", "greenway", and "transit station". Shopping center development was prohibited. Plaintiff claimed that the zoning designations rendered his property "substantially valueless". 581 P.2d at 60. He contended that the entire property had been taken, without distinguishing between the various zones. In dicta the court divided the property analytically into two separate parcels: (1) those classified commercial or residential, and (2) those classified "greenway" or "transit station". As to the first, a substantial beneficial use remained, so there was no taking. As to the second, the court said that a cause of action for inverse condemnation could be stated.[4]

As was the situation in *Agins*, 100 S.Ct. at 2141, appellant here did not submit a plan for development of its property under the ordinance. Consequently, "there is as yet no concrete controversy regarding the application of the specific zoning provisions." *Id.* The only question presented "is whether the mere enactment of the zoning ordinances constitute a taking." *Id.*

■ We agree with the district court that the ordinance is reasonably related to permissible governmental goals. These goals include protection from "the ill-effects of urbanization". *Id.* 100 S.Ct. at 2142.[5]

---

3. The court did not reach the taking issue. It adopted a special master's finding that the residential zone "would not promote the health, safety, convenience, and general welfare of the inhabitants of that part of the defendant city", and thereby exceeded the city's police power. 277 U.S. at 187, 48 S.Ct. at 448.

4. The Oregon Supreme Court did not reach the taking issue, holding that the plaintiff failed to exhaust administrative remedies.

5. Appellant contends that there are material factual disputes regarding (a) the County's intent in applying the ordinance to the Spit, and (b) the adequacy of the data supporting the Spit's zoning designation. We agree with the district court that summary judgment was

The next question is whether "justice and fairness require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. This turns initially on whether the parcel in question is the Spit alone or the Point and Spit together. We hold that this is, in part, a factual issue. Summary judgment was therefore inappropriate. *Beltz Travel Service v. International Air Transport Association*, 620 F.2d 1360, 1364 (9th Cir. 1980).

■ The ordinance isolates the Spit in a unique zone. Appellant has presented affidavits that there were economically viable uses for the Spit which were extinguished by the ordinance. Appellant has also presented evidence that the Spit was treated differently for zoning purposes than other property, including the Point. In sum, appellant alleges a deprivation by a non-uniform ordinance of a portion of its property which is substantial and otherwise economically viable.[6] This tends to require that the zoning of the Spit be evaluated separately from that of the Point for taking purposes. Yet because appellant did not submit a development plan, it is unclear whether the Spit and Point would be treated separately at the development stage. This fact could be crucial. The County might make some provision for density transfers or otherwise permit shifting of benefits and burdens between the two. *See Penn Central*, 438 U.S. at 136–37, 98 S.Ct. at 2665–2666. Administrative procedures governed by local ordinances play a key role in defining the nature of these benefits and burdens. Until appellant submits a development plan, and the County has an opportunity to pass on it, it is impossible to determine whether the Point and Spit ought to be treated as one parcel or as two. *See Agins*, 100 S.Ct. at 2141–42.

■ If appellant can bear the heavy burden of showing that compliance with local ordinances would be futile, it need not comply. We need not decide at what point it becomes futile for a landowner to submit development plans after prior submissions have been rejected by the zoning authority. We note that two plans were submitted and rejected in *Penn Central*. 438 U.S. at 116 & n. 17, 136–38 & nn. 34 & 36, 98 S.Ct. at 2655 & n. 17, 2665–2666 & nn. 34 & 36. We remand to allow appellant the opportunity to make such a showing.

■ Should it be necessary to reach the merits of the case, we offer the following as

proper as to these issues. Appellant did not show sufficient evidence of precondemnation activity to demonstrate an intent to reserve the Spit for public benefit. Compare *Drake's Bay Land Co. v. United States*, 424 F.2d 574 (Ct.Cl. 1970). The adequacy of the data the County relied on is fairly debatable. In such circumstances we do not substitute our judgment for that of the County's legislative body. The appellant did not present sufficient evidence on these questions to overcome the presumption that they are reasonable. See *Kopetzke v. County of San Mateo*, 396 F.Supp. 1004, 1007–1009 (N.D.Cal.1975).

**6.** These facts distinguish this case from *Penn Central, supra*, and *Gorieb v. Fox*, 274 U.S. 603, 47 S.Ct. 675, 71 L.Ed. 1228 (1927). In *Penn Central* the property alleged to have been taken was the air rights above Grand Central Terminal. The ordinance challenged in that case applied to a large number of parcels in New York City. 438 U.S. at 134–35 & nn. 31 & 32, 98 S.Ct. at 2664–2665 & nn. 31 & 32. The Court refused to treat the air rights differently from the underlying land. 438 U.S. at 130 and n. 27, 98 S.Ct. at 2662 & n. 27. *See also Griggs v. Allegheny County*, 369 U.S. 84, 89, 82 S.Ct. 531, 533–534, 7 L.Ed.2d 585 (1962); *United States v. Causby*, 328 U.S. 256, 265–67, 66 S.Ct. 1062, 1067–1068, 90 L.Ed. 1206 (1946). Thus the question in that case was the economic viability of the entire Terminal site. 438 U.S. at 138 & n. 36, 98 S.Ct. at 2666 & n. 36. In *Gorieb v. Fox, supra*, the petitioner challenged the constitutionality of an ordinance creating a setback or building line from the street. The Court upheld the ordinance as not clearly arbitrary or unreasonable but having a substantial relation to the general welfare. 274 U.S. at 610, 47 S.Ct. at 677–678. The property alleged to have been taken was a 34 foot strip adjacent to the street. The ordinance attacked applied to the entire city. 274 U.S. at 604, 47 S.Ct. at 675–676. *Gorieb* did not contend that the strip of property affected was economically viable separate from the lot of which it was a part. The Court addressed only the issue of arbitrariness. It did not speak to the loss of use of the strip. 274 U.S. at 608–610, 47 S.Ct. at 677–678.

guidance for the district court. Appellant must initially bear the burden of showing that the Spit and Point have been, or would be, treated separately when its development plans are submitted and considered. If appellant makes this showing, the Spit must be analyzed as a separate parcel for taking purposes.

The determination as to whether the Spit has been taken depends upon the nature and extent of the interference with the appellant's rights. *See Penn Central*, 438 U.S. at 130–31, 98 S.Ct. at 2662–2663. In determining the nature of that interference, the court must determine whether the appellant has actually been deprived of rights or whether those rights have instead been transferred to other property. *Penn Central*, 438 U.S. at 137, 98 S.Ct. at 2666. Once appellant has shown separate treatment at the classification and development stages, the burden is on the County to show a transfer of development rights. The court must also consider whether any diminution in market value is compensated by any benefits conferred by the zoning ordinance. *See Agins*, 100 S.Ct. at 2142.

Once the court has taken all of these considerations into account, it must determine whether justice and fairness require that appellant's loss be compensated by the government. *See Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659; *Goldblatt v. Town of Hempstead*, 369 U.S. at 594, 82 S.Ct. at 990; *Haas v. City & County of San Francisco*, 605 F.2d at 1120. This is essentially an ad hoc factual inquiry. *Penn Central, supra.* It turns upon "the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment backed expectations...." *Id.*

More precise delineation depends upon the facts of a particular case.

REVERSED AND REMANDED.

MERRILL, Circuit Judge, concurring and dissenting:

I agree with the majority that summary judgment was inappropriate and that the case must be remanded for trial on the question of taking—the question whether, as stated in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), "justice and fairness require that economic injuries caused by public action be compensated by the government."

As far as the single-parcel/two-parcel question is concerned, it cannot be answered without examining the reason for the inquiry. As I view it, the rule is designed as an aid in determining what, in the particular case, is just and fair to the landowner. Here, if it is just and fair under the circumstances that the Point's economic values be taken into consideration in examining the economic effect of the zoning on the Spit, then it should follow that the Point and the Spit be treated as a single parcel. On the other hand, if it is just and fair under all of the circumstances to consider the Spit as an independent land area, then the two-parcel treatment should result.

I do not believe that any handy rule of thumb can be devised to determine what is fair and just in a particular case.[1] Each case must stand on its facts. Thus, I agree with the majority that the question of single-parcel/two-parcel should not turn on continuity plus common ownership, as the district court held. These considerations are relevant but should not be dispositive. I agree with the majority that all of the

1. "Fairness requires that individuals be treated not merely as means to social ends but rather as persons who deserve respect as ends in themselves. Although fairness standards are necessarily indeterminate, courts faced with particular challenges to zoning measures must nonetheless ask whether those measures exact such a disproportionate sacrifice from individual property holders relative to their peers and to their expectations that the

affected individuals may be seen as having been treated solely as a means in a process of social engineering."
*Developments in the Law*—Zoning, 91 Harv.L. Rev. 1429, 1492 (1978). *See generally* Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv.L.Rev. 1165, 1190–92, 1229–34 (1967); Sax, Takings and the Police Power, 74 Yale L.J. 36 (1964).

factors specified in the opinion as ultimately bearing on the merits of the case are relevant. I would add to them the geological history and physical characteristics of the Spit, the effect of any navigational easement that may exist across the land connecting the Spit to the Point, and the prospect of the Spit reverting to or becoming an island. I would also take into consideration the history of the county's treatment of the Spit,[2] the extent and nature of the public benefit which one might expect to result from the classification; the extent to which traditional planning principles support a density limitation such as the one imposed.

My disagreement with the majority is largely in matters of procedure. I think trial on the question of taking should go forward forthwith. I do not think we should impose on appellant the burden of presenting a development plan to the county before being able to prove diminution in value. *Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), cited by the majority, does not require this burden. In that case the density limitations of the challenged zoning ordinance were not precisely spelled out: Agins could build anywhere from one to five dwelling units on his parcel, depending upon the city's assessment of his development plan. The development plan was required only because without one, on the facts of that case, there was no concrete controversy to be adjudicated; until the plan was presented and acted upon the precise density limitations to be imposed upon the property were not known. *See Agins*, 447 U.S. at 260–261, 100 S.Ct. at 2141.

Here the zoning ordinance on its face is precise. The owner asserts that the prescribed density limitations for the Spit—one multiple residential unit per five acres make economic development infeasible. This case is now ripe for adjudication.[3]

If the county, in avoidance of appellant's proof of diminution in value, is prepared to make provision for density transfers or otherwise permit shifting of benefits and burdens between the Point and the Spit, the *county* should come forward with its proposals. The owner should not be required to prove the negative, by going to the trouble and expense of presenting a development plan which it believes to be economically infeasible.

I would remand for trial forthwith.

---

**2.** In this connection I find myself in disagreement with footnote 6 of the majority opinion. I think there is ample in the facts recited in the text of the opinion to demonstrate an intent to reserve the Spit for public benefit. It would appear that even after the zoning ordinance in question was adopted (May 14, 1974), the county adopted (August, 1974), a plan depicting the Spit on a map as "urban open space." Since this was consistent with recommendations made from 1968 on (emanating from City-County Planning Council, Strawbery Park and Recreation District, and County Park, Recreation and Open Space Commission), that the county acquire the Spit, it would seem that in zoning the Spit the county still had acquisition in mind. If this zoning is found to be a step toward acquisition, the single-parcel/two-parcel question becomes irrelevant; a taking in either event has occurred.

**3.** The majority implies that *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), also lends support for the requirement of a development plan in the case at bar, since two development plans were filed and rejected in *Penn Central* before the property owners there filed suit. The majority suggests that appellant in the present case should make "such a showing" by first filing a development plan with the county. *See* majority opinion at 368.

I must disagree. The New York City Landmarks Preservation Law at issue in *Penn Central* does not prohibit alteration. Nor does it place specific limitations on permissible alteration. Instead, it requires that once a building has been properly designated a landmark, the owner who wishes to alter the building must submit a plan to the Landmarks Preservation Commission for approval. Only after that body acts to make specific the inchoate restrictions placed on the use of property previously designated a landmark is the constitutional claim ripe.

In the case at bar, however, the zoning ordinance on its face indicates precisely what restrictions are placed on the owner's use of the property. Thus the history of the *Penn Central* controversy serves only to emphasize that a development plan is not required in this case.