**Norman A. ZILBER, Plaintiff,**

v.

**TOWN OF MORAGA, Defendant.**

**No. C–87–1613 EFL.**

United States District Court,
N.D. California.

Aug. 22, 1988.

Robert L. Dunn, Bancroft, Avery & McAlister, San Francisco, Cal., for plaintiff.

Charles J. Williams, Williams & Robbins, Martinez, Cal., for defendant.

## MEMORANDUM DECISION

LYNCH, District Judge.

This action arises from defendant Town of Moraga's one-and-a-half-year moratorium on certain development applications and the passage of the Moraga Open Space Ordinance ("MOSO"). Plaintiff Zilber contends that the Town's actions violate the taking clause of the fifth amendment as well as substantive due process principles. The case is presently before the Court on the Town's motion for summary judgment. For the reasons explained below, the motion is granted.

## BACKGROUND

As trustee for several entities, Zilber owns a number of undeveloped parcels of property in the Town. In either 1981 or 1982, Zilber hired a developer to prepare and submit a development plan for the property. The developer submitted the plan but withdrew it prior to receiving a decision.

In late 1983, Zilber entered an agreement with a new developer, in which the developer obtained an option to purchase the property for $1.7 million. The developer filed two alternative applications for "conceptual development plan approval."[1] On October 15, 1985, the Town Council enacted a moratorium on processing and approving subdivision applications pending completion of study of the general plan regarding ridge and hillside open space. The moratorium remained in effect until April 1, 1987.

The moratorium put a halt to consideration of the developer's application. Accordingly, the developer ceased pursuing its development plans and awaited the outcome of the April 1986 election. In that election, MOSO, an initiative measure, was enacted. Subsequently, the developer neither pursued its development plans nor exercised its purchase option, and the Town never issued a decision on the development application.

MOSO seeks to "protect the remaining open space resources within the Town." Its purpose is to further a variety of interests, including "ensuring that development does not occur in sensitive viewshed areas [and] protecting the health and safety of the residents of the Town by restricting development on steep or unstable slopes...." MOSO restricts development of open space primarily by prohibiting development on slopes of greater than 20% and on crests of minor ridgelines, and by limiting maximum density of development in open space and "high risk" areas.

After MOSO's enactment, the Town Council adopted guidelines for interpreting and implementing MOSO. Among other things, the guidelines establish a method for slope calculation and set standards for determining whether a region is a "high risk" area. In addition, the guidelines provide a vested rights exemption and a procedure called a "status determination." A "status determination" allows a property owner to obtain from the Town an assessment of whether his or her property is

subject to MOSO, and if so, the Town will provide determinations on high risk areas, slope calculation, maximum permitted density, and permissible density transfers. Zilber has never sought a status determination.

The parties agree that at least some of Zilber's property is subject to MOSO. However, they dispute the extent to which MOSO restricts development. The Town concedes that the property includes land where development is prohibited, but contends that permissible density where development is not prohibited has yet to be determined. Zilber, on the other hand, asserts that the Town's estimate of undevelopable areas is understated and, in any event, that MOSO's practical effect is to render any meaningful development impossible.

## DISCUSSION

In his complaint, Zilber advances four claims: (1) MOSO "as applied" to Zilber's property works a "permanent taking" without compensation in violation of the fifth amendment; (2) MOSO on its face works a "permanent taking" without compensation; (3) the development moratorium and MOSO work a "temporary taking" without compensation; and (4) MOSO and the moratorium entitle Zilber to a remedy under California's inverse condemnation law. In his motion papers, Zilber asserts that his takings allegations also state a claim for violation of substantive due process. The Court will treat the claims in the order listed.

### I. The "As-Applied" Claim

In order to recover on a taking claim based on government land use regulation, a plaintiff must establish two elements. First, the claimant must show "that the regulation has in substance 'taken' his property." *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986). Second, he "must demonstrate that any proffered compensation is not 'just.'" *Id.*

1. Conceptual development plan approval is the first stage of a three-stage approval process. The other two steps are filing and approval of a general development plan and a precise development plan. Moraga, Cal., Municipal Code § 3608.

■ From these substantive elements, the Supreme Court and the Ninth Circuit have developed two "ripeness" principles permitting review on the merits only after certain threshold requirements are met. The first principle, drawn from the initial substantive requirement, provides that "an essential prerequisite to [assertion of the claim] is a final and authoritative determination of the type and intensity of development legally permitted on the subject property." *Id.; see also Williamson Planning Commission v. Hamilton Bank,* 473 U.S. 172, 191, 105 S.Ct. 3108, 3119, 87 L.Ed.2d 126 (1984) (claim may not be evaluated "until the administrative agency has arrived at a final definitive position regarding how it will apply the regulations at issue to the particular land in question"); *Agins v. Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) ("[b]ecause the appellants have not submitted a plan for development of their property as the ordinances permit, there is as yet no concrete controversy regarding the application of the specific zoning provisions"); *Shelter Creek Dev. Corp. v. City of Oxnard,* 838 F.2d 375 (9th Cir.1988); *Herrington v. County of Sonoma,* 834 F.2d 1488 (9th Cir.1987); *Lake Nacimiento Ranch Co. v. San Luis Obispo County,* 830 F.2d 977 (9th Cir. 1987), *amended,* 841 F.2d 872 (1988); *Kinzli v. City of Santa Cruz,* 818 F.2d 1449 (9th Cir.), *amended,* 830 F.2d 968 (1987). The second ripeness principle holds that "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Williamson,* 473 U.S. at 195, 105 S.Ct. at 3121.[2]

■ Under the "final decision" rule, a property owner's as applied taking claim is not ripe until the government has rejected at least one meaningful development application and denied at least one request for a variance. *See Williamson,* 473 U.S. at 193–94, 105 S.Ct. at 3120; *Shelter Creek,* 838 F.2d at 377; *Kinzli,* 818 F.2d at 1454.

In some cases, a claim may not be ripe until several plans have been submitted and rejected. *See, e.g., MacDonald,* 106 S.Ct. 2567–68.

■ The Ninth Circuit, however, recognizes a "futility exception" to the final decision requirement: "the requirement of the submission of a development plan is excused if such an application would be an 'idle and futile act.'" *Kinzli,* 818 F.2d at 1454. But the development of the futility exception has been uneven. At least initially, the Ninth Circuit applied no bright line rule in determining whether the futility exception was available in any given case. For example, in *American Savings & Loan Ass'n v. County of Marin,* 653 F.2d 364, 371 (9th Cir.1981), the court indicated that the matter is one of degree, finding the exception applicable when a sufficient number of development applications have been rejected. Similarly, in *Norco Const., Inc. v. King County,* 801 F.2d 1143, 1145 (9th Cir.1986), the court stated that compliance with local ordinances is futile when it is "clear beyond peradventure that excessive delay in such a final determination has caused the present destruction of the property's beneficial use." *See also Martino v. Santa Clara Valley Water Dist.,* 703 F.2d 1141, 1146 n. 2 (9th Cir.), *cert. denied,* 464 U.S. 847, 104 S.Ct. 151, 78 L.Ed.2d 141 (1983) (futility exception recognized but not defined).

In *Kinzli,* however, the Ninth Circuit apparently abandoned this case-by-case approach for a bright line rule. There, the district court ruling was consistent with previous decisions in that it treated the matter as a fact-bound issue not susceptible to resolution by a single inflexible rule:

Whether the controversy is ripe under *Agins* or whether plaintiffs should be excused on futility grounds can only be decided in the larger context of what uses remain. If there appear to be viable permissible uses under the Ordinance, plaintiffs must submit a develop-

---

2. In view of this Court's disposition of the claim on the basis of the first ripeness principle, it need not address the applicability of the second ripeness principle to this claim. *See* § II.A.2. below.

ment plan or application. If, however, the Ordinance deprives plaintiffs of any beneficial use, they should not be compelled to pursue futile procedures.

*Kinzli v. City of Santa Cruz*, 620 F.Supp. 609 (N.D.Cal.1985). The Court of Appeals rejected this approach:

> We reject the district court's view that futility may be determined, absent any rejected development plan, by inquiring whether any beneficial use remains, or whether the regulatory regime inhibits the property's marketability. Adoption of such standards would require courts to speculate as to what potential uses may be lurking in the hopes of the property owner and in the minds of developers and city planners. This would result in the same sort of speculation that the ripeness doctrine prohibits.

*Kinzli*, 818 F.2d at 1454.

The *Kinzli* court then proceeded to interpret the Supreme Court cases to require that *"at least one* application must be submitted before the futility exception applies." *Id.* (emphasis in original). Moreover, the application must be "meaningful." *Id.* at 1455.

The *Kinzli* court also indicated that the futility exception will not apply until a meaningful application for a variance has been denied. In footnote 6, the court stated:

> Under *Hamilton Bank's* ripeness requirements, a plaintiff must also show that an application for a variance was denied. It follows from the above discussion that the futility exception would excuse this requirement if at least one "meaningful application" for a variance is denied.

*Kinzli*, 818 F.2d at 1455 n. 6 (citations omitted).[3] Since the Kinzlis had withdrawn their application prior to a final decision, the application was not meaningful, the case was not ripe, and the futility exception did not apply.

As harsh and counterintuitive as it may sound, *Kinzli* seems to stand for the proposition that, when a local land use ordinance provides prompt and fair development application and variance procedures,[4] the futility exception to the final decision requirement will not apply, absent at least one rejected application and one rejected variance request, even when the local statute clearly precludes approval of any meaningful application. In other words, the *Kinzli* court held that a property owner must make use of the development and variance application procedures even when the statute deprives the property owner of all beneficial uses and the application will therefore be denied.[5] Thus *Kinzli* converted the futility "exception" into a reiteration of the general final decision rule: no claim will be heard on the merits until rejection of development and variance applications.

Subsequent decisions have confirmed this interpretation of *Kinzli*. They cite *Kinzli*, without criticism, for the proposition stated above, and rely on that rule to dispose of taking claims. *See, e.g., Lake*

---

**3.** This footnote is somewhat troubling because it appears to be oxymoronic. The second sentence seems to say that the requirement of a variance application denial may be excused, but only if a variance application is denied. In other words, the requirement is excused if it is met.

**4.** *Kinzli* seemed to acknowledge the continued validity of the *Norco* delay-type futility, as the court felt it necessary to note that the requisite delay did not appear in that case. *See Kinzli*, 818 F.2d at 1454 n. 5. The court also recognized that "a property owner is not required to pursue an application through 'unfair procedures.'" *Id.* at 1455.

**5.** This rule seems to be a departure from the ripeness principle enunciated by the Supreme Court. The teaching of *Williamson* and *Mac-*

*Donald* was that courts should not speculate about whether a city will apply a zoning statute to preclude all beneficial use. Consequently, the property owner must pursue any procedures by which he may develop available beneficial use of the property before challenging application of the statute. However, implicit in this rule is the premise that the statute leaves some beneficial use to the property owner. If it does not, then submission of a development application to obtain approval for a beneficial use would be pointless and therefore no speculation about the outcome of the application would be necessary. But this premise, applied by the district court in *Kinzli*, is precisely the one rejected by the Ninth Circuit.

*Nacimiento Ranch Co. v. San Luis Obispo County*, 841 F.2d at 876–77 (under *Kinzli*, failure to submit development application precludes application of futility exception); *Shelter Creek*, 838 F.2d at 379 (*Kinzli* held that futility exception "unavailable unless and until landowner has submitted at least one 'meaningful application' for development of property and one 'meaningful application' for a variance").

Accordingly, although this Court is less than comfortable with the *Kinzli* rule, it is well established in this circuit and therefore binding upon the Court. The question, then, is whether the final decision requirement, as interpreted by *Kinzli* and its progeny, bars Zilber's as-applied challenge to MOSO. The simplicity of the *Kinzli* rule leaves little doubt the claim is indeed barred.

■ While Zilber did, through a developer, submit a development plan for approval, the Town never issued a final decision on that application. However reasonable it may have been for the developer to give up on that application after the enactment of MOSO, *Kinzli* and the subsequent cases are clear that the absence of a final rejection of a development application precludes assertion of the claim. *See, e.g., Kinzli*, 818 F.2d at 1455 (application "not meaningful since it was abandoned at an early stage in the application process").

Even if the Town had formally and finally rejected the developer's plan, the ripeness doctrine would bar the claim because the application was not "meaningful." This is because the plan was submitted prior to passage of the law that Zilber contends constitutes a taking. Since Zilber has never submitted a plan under the terms of MOSO, any plan submitted under another statute would provide no guidance as to the Town's "final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson*, 473 U.S. at 191, 105 S.Ct. at 3119.

Zilber's failure to utilize the "status determination" procedure under MOSO further reinforces the conclusion that the claim is not ripe. By establishing the applicability and impact of MOSO on a particular parcel of land, a status determination accomplishes precisely what the ripeness doctrine requires. Since Zilber did not pursue such a determination, he is asking this Court to make the assessment that the ripeness doctrine requires from the Town. *Kinzli* and subsequent cases clearly preclude such judicial "speculation."

In summary, under *Kinzli*, both the general final decision rule and the futility "exception" require a rejection of a "meaningful development application" prior to assertion of an "as-applied" taking claim. Since Zilber has never submitted a development plan under MOSO, nor applied for a "status determination," his claim is unripe and therefore barred.

## II. The "Facial" Claim

### A. Ripeness

### 1. The Final Decision Requirement

■ Zilber's next claim, that MOSO on its face constitutes a taking without just compensation, is not subject to the "final decision" ripeness requirement. In *Martino v. Santa Clara Valley Water Dist.*, 703 F.2d 1141, 1146–47 (9th Cir.1983), the Court held that "the failure to submit a development plan is not, in and of itself a bar to an attack on the ordinance 'on its face.'" Rather, such a failure "merely prevent[s] the landowners from attacking the regulation 'as applied.'" *Id.* at 1146; *see also Agins*, 447 U.S. at 260, 100 S.Ct. at 2140. Subsequent cases have also invoked the final decision principle only in connection with as-applied claims. *See, e.g., Lake Nacimiento*, 841 F.2d at 876–77 (as applied claim dismissed as unripe, facial challenge treated on the merits).

This distinction between facial and as-applied challenges for purposes of final decision ripeness flows naturally from the differing nature of the two types of claims. Since the issue in a facial challenge is whether "mere enactment of the zoning ordinances constitutes a taking," *Agins*, 447 U.S. at 260, 100 S.Ct. at 2141, there is no need for a final decision by the enforcing authority as to how the law will be

applied in a particular case. Put different-ly, a court need not know how a statute will be administered to determine whether it constitutes a taking on its face. There-fore final decision ripeness is not a bar to Zilber's taking claim.

### 2. *Pursuit of State Remedies Requirement*

■ As noted above, the Supreme Court in *Williamson* reasoned that because a state's action "is not 'complete' until the State fails to provide adequate compensa-tion for the taking," a claim is premature unless the claimant has already pursued any "reasonable certain and adequate" state procedure for obtaining such compen-sation. 473 U.S. at 194–95, 105 S.Ct. at 3120–21.[6] However, it is uncertain wheth-er this ripeness principle applies to facial challenges to land use regulations. On the one hand, there seems no logical reason to distinguish the facial and as-applied chal-lenges in this regard. If a state provides adequate procedures for compensating losses caused by land use regulation, it would seem to make no difference whether the claim is premised on a facial or as-ap-plied challenge—either theory could result in recovery. On the other hand, a recent Ninth Circuit case, addressing both types of challenges, omitted any discussion of this issue even though the claimant appar-ently did not pursue available state com-pensation remedies. In *Lake Nacimiento*, the Court disposed of the as-applied chal-lenge on the basis of final decision ripe-ness, but reached the merits on the facial challenge. *Lake Nacimiento*, 830 F.2d at 980–82. The court offered no explanation

why the second type of ripeness did not bar the claim.

Fortunately, this Court need not resolve this dilemma. In *Williamson*, the Su-preme Court stated that the Constitution requires only that a reasonable, certain and adequate provision for obtaining compensa-tion "exist at the time of the taking." 473 U.S. at 194, 105 S.Ct. at 3120. Presumably, therefore, the Court intended that state remedies ripeness would bar the claim only if satisfactory procedures for compensation were in place when the regulation effected the taking. In this case, such remedies did not exist at the time of the alleged taking.

When the moratorium and MOSO took effect, the law in California provided that only declaratory and injunctive relief were available in an inverse condemnation claim based on a regulatory taking. *See Agins v. City of Tiburon*, 24 Cal.3d 266, 157 Cal. Rptr. 372, 598 P.2d 25 (1979), *aff'd on other grounds*, 447 U.S. 255, 100 S.Ct. 658, 62 L.Ed.2d 639 (1980). Since state courts would not provide damages, the state pro-cedure for compensating regulatory tak-ings was not adequate within the meaning of *Williamson*. *See Furey v. City of Sac-ramento*, 780 F.2d 1448 (9th Cir.1986); *Cf. Austin v. City and County of Honolulu*, 840 F.2d 678, 681 (9th Cir.1988) ("[u]ntil the state courts establish that landowners may not obtain just compensation through an inverse condemnation action under any cir-cumstances, [state] procedures are ade-quate within the meaning of *Williamson County*").

In *First English Evangelical Lutheran Church v. Los Angeles County*, ——— U.S.

---

6. For lack of a better term, the Court will refer to this principle as "state remedies ripeness." Admittedly, this phrase has connotations of an exhaustion of remedies requirement, a require-ment that the Supreme Court has rejected in suits predicated on 42 U.S.C. § 1983. *See Patsy v. Florida Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). But it is unclear how state remedies ripeness differs in substance from an exhaustion requirement.

In *Williamson*, which developed state reme-dies ripeness, the Supreme Court explained that final decision ripeness differed from an exhaus-tion of remedies requirement because it is con-cerned with "whether the initial decisionmaker has arrived at a definitive position on the issue

that inflicts an actual, concrete injury." 473 U.S. at 193, 105 S.Ct. at 3120. This rationale, however, does not apply to state remedies ripe-ness and the Court offered no substitute distin-guishing principle. While state remedies ripe-ness is premised on the notion that only *uncom-pensated* takings are constitutional violations, this does little to explain why a landowner must initially demand such compensation in state court even when the issues would be identical to those in a taking claim in federal court. Ac-cordingly, state remedies "ripeness," for all in-tents and purposes, appears to be an exception to *Patsy's* holding that exhaustion of state reme-dies is not a prerequisite to section 1983 actions.

——, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), the Supreme Court overruled the California Supreme Court's decision in *Agins,* holding that this limitation on remedies violated the just compensation clause of the fifth amendment. Thus the Court eliminated the defect in California law that rendered the inverse condemnation procedure inadequate for ripeness purposes. Nevertheless, *Williamson* requires that to make a claim unripe, the state procedure must be adequate at the time of the taking. Since the change in California law occurred after the alleged time of the taking in this case, the case remains ripe with respect to the state remedies requirement.[7]

### B.   The Merits

■ Zilber faces "an uphill battle in making a facial attack on [MOSO] as a taking." *Keystone   Bituminous   Coal Ass'n v. DeBenedictis,* 94 L.Ed.2d 472, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). He must show that the statute's "mere enactment" amounted to a taking. Specifically, he must demonstrate that the statute either (1) does not substantially advance legitimate state interests, or (2) denies economically viable use of subject property. *See Agins,* 447 U.S. at 260, 100 S.Ct. at 2141.

With respect to the first part of the test, MOSO clearly survives. By prohibiting development in areas subject to erosion, the Town substantially advances its legitimate interest in the health and safety of its residents. Similarly, density restrictions are permissible means of protecting open space and "sensitive viewshed areas." Accordingly, MOSO is not vulnerable to attack under the "substantial advancement" test, and Zilber does not strongly argue otherwise.

The primary thrust of Zilber's claim is under the second test; he insists that the statute deprives him of all economically viable use of his property. Of course, the

point at which a land use regulation "goes too far" and becomes a taking is, to say the least, "elusive and has not been clarified by the Supreme Court." *Lake Nacimiento,* 841 F.2d at 877.

One trend is apparent, however. In facial challenges, the courts are increasingly aware that the analysis should be largely independent of the specific circumstances of the property owner asserting the claim. In *Keystone,* for example, the Court stated that:

> The posture of the case is critical because we have recognized an important distinction between a claim that the mere enactment of a statute constitutes a taking and a claim that the particular impact of government action on specific piece of property requires the payment of just compensation.

107 S.Ct. at 1247.

The Court then proceeded into a discussion of its decision in *Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed. 2d 1 (1981). In *Hodel,* the Court noted that there is no set formula for determining when a taking occurs and that the approach has been to engage in "essentially ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the government action—that have particular significance." *Id.* at 295, 101 S.Ct. at 2370 (quoting *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979)). At that point the *Hodel* Court strongly indicated that such particularized factual determinations are inappropriate in a facial challenge:

> These "ad hoc, factual inquiries" must be conducted with respect to specific property, and the particular estimates of eco-

---

**7.** While there is some precedent indicating that ripeness may be "lost," *see* Wright, Miller & Cooper, *Federal Practice & Procedure,* Jurisdiction 2d § 3532.1 at 132 ("[m]any find that although a dispute was once ripe, ripeness has been lost to overtaking events"), these cases do not control here because the Supreme Court has

clearly indicated that state remedies ripeness will not bar the claim if state procedures are inadequate at the time of the taking. The Court evidently sought to ensure that fluctuations in state law would not affect federal jurisdiction over these claims.

nomic impact and ultimate valuation relevant in the unique circumstances.

Because appellee's taking claim arose in the context of facial challenge, *it presented no concrete controversy concerning either application of the Act to particular surface mining operations or its effect on specific parcels of land.* Thus the only issue properly before the District Court and, in turn, this Court, is whether the "mere enactment" of the Surface Mining Act constitutes a taking. *Id.* (emphasis added).

In accordance with this view of facial challenges, *Hodel* treated the merits of the facial challenge in a single paragraph and without reference to the unique circumstances of the claimant:

> Except for the proscription of mining near certain location by § 522(e), the Act does not categorically prohibit surface coal mining; it merely regulates the conditions under which such operations may be conducted. The Act does not purport to regulate alternative uses to which coal-bearing lands may be put. Thus, in the posture in which these cases come before us, there is no reason to suppose that "mere enactment" of the Surface Mining Act has deprived appellees of economically viable use of their property.

*Id.* at 296–97, 101 S.Ct. at 2370–71 (footnotes omitted).[8] Moreover, the Court stated explicitly that the landowner "cannot at this juncture legitimately raise complaints in this Court about the manner in which the challenged provisions of the Act have been or will be applied in specific circumstances, or about their effect on particular mining operations," because the landowner had not attempted to obtain a variance or waiver. *Id.* at 297, 101 S.Ct. at 2371. Thus the Court left no doubt that examination of the particularized impact of a statute on the claimant's land is inappropriate pursuant to a facial challenge.

The Ninth Circuit's decision in *Lake Nacimiento* further supports the view that the proper analysis in facial challenges should look only to the statute. Citing *Agins* and *Hodel,* the court stated that "[g]enerally, the existence of permissible uses determines whether a development restriction denies a property holder the economically viable use of its property." 841 F.2d at 877. After noting that the regulation in question provided for variances and "special uses," the court ruled that "[t]his fact alone logically prevents the ordinance from being overrestrictive on its face, since the Ranch could apply for a variance or waiver of the restrictions." *Id.* In other words, rather than engage in detailed analysis of the statute's effect on a specific piece of property, the court simply found that uses available in the language of the statute insulated it from facial attack.

The court further emphasized the distinction between facial and as-applied analysis when, in response to the claimant's contention that it had been deprived of its "profit expectation," the court cast doubt on whether such considerations were appropriate in the context of a facial challenge and rejected the argument because the claimant "remain[ed] free to pursue its profit expectations by submitting a development application to the County." *Id.* at 878 & n. 4. Thus, like the *Hodel* Court, the court in *Lake Nacimiento* declined to engage in "as-applied" analysis when that type of challenge was not yet ripe.

Applying the *Hodel* analysis to Zilber's facial attack on MOSO, it is clear that the claim must fail. As in *Hodel,* the regulation here, with narrow exceptions, does not

---

8. As noted, the *Keystone* Court appeared to endorse this approach to facial challenges since it cited these portions of *Hodel* to illustrate the "important distinction between a claim that the mere enactment of a statute constitutes a taking and a claim that the particular impact of government action on specific piece of property requires the payment of just compensation." 107 S.Ct. at 1247. Inexplicably, however, *Keystone* proceeded into a rather detailed analysis of the statute's impact on the claimant's proper- ty almost immediately after its discussion of *Hodel. Id.* at 1248–55. Thus, after reiterating its commitment to the *Hodel* principle that facial challenges look only to the statute, the Court failed to follow this approach, engaging instead in an "as-applied" analysis. Nonetheless, *Keystone's* affirmance of the *Hodel* approach in principle, if not practice, convinces this Court that it should follow the *Hodel* analytical model.

categorically prohibit development, but merely restricts it. In every area but the crests of "minor ridgelines" and certain slopes, development remains permissible, albeit limited. Thus, at least in those areas where development is only limited, permissible beneficial uses remain and the statute therefore is not subject to facial attack. *See Hodel,* 452 U.S. at 297, 101 S.Ct. at 2371; *Lake Nacimiento,* 841 F.2d at 877–78.

Zilber argues, however, that MOSO deprives him of all beneficial use of his property on minor ridgelines, since no development is permitted in those areas. Nevertheless this Court is of the view that "taking" analysis does not permit a landowner to parse up his property in order to make a claim. In *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Supreme Court rejected such a notion:

> "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole....

*Id.* at 130–31, 98 S.Ct. at 2662.

Zilber seeks to distinguish *Penn Central* by relying on the Ninth Circuit's decision in *American Savings & Loan Ass'n v. County of Marin,* 653 F.2d 364 (9th Cir.1981). In that case, the property owner argued that a zoning ordinance had the effect of "taking" one portion of a parcel of its property. The court distinguished *Penn Central* and similar cases on the ground that in those cases "the entire subject property was covered by a uniform restriction." *Id.* at 369. The court therefore concluded that "[t]he question here is whether the challenged ordinance creates two separate parcels for taking purposes by adopting different zoning designations for each parcel." *Id.* at 370.

The *American Savings* court declined to answer the question in the context of the as-applied claim because the claimant's failure to submit a development plan rendered an as-applied challenge unripe. Turning to the facial challenge, the Court noted that the property owner alleged "a deprivation by a nonuniform ordinance of a portion of its property which is substantial and otherwise economically viable." According to the court, this tended to require separate analysis of the two portions of the property. However, the court again declined to reach such a conclusion until the property owner submitted a development application:

> [I]t is unclear whether [the two areas] would be treated separately at the development stage. This fact could be crucial. The County might make some provision for density transfers or otherwise permit shifting of benefits and burdens between the two.... Until appellant submits a development plan, and the County has an opportunity to pass on it, it is impossible to determine whether the [two areas] ought to be treated as one parcel or two.

*Id.* at 371.

*American Savings* does not support Zilber's position for at least two reasons. First, it is doubtful that the case is still good law. In *Keystone,* the Supreme Court essentially rejected the *American Savings* court's notion that segments of property may be analyzed separately if a "nonuniform regulation" affects various segments differently. In discarding such an argument, the Court stated that:

> Many zoning ordinances place limits on the property owner's right to make profitable use of some segments of his property. A requirement that a building occupy no more than a specified percentage of the lot on which it is located could be characterized as a taking of the vacant area as readily as the requirement that coal pillars be left in place. Similarly, under petitioners' theory one could always argue that a set-back ordinance requiring that no structure be built within a certain distance from the property line constitutes a taking because the footage represents a distinct segment of property for takings law purposes. *Cf.*

*Gorieb v. Fox,* 274 U.S. 603, 47 S.Ct. 675, 71 L.Ed. 1228 (1927) (upholding validity of set-back ordinance) (per Holmes, J.). 107 S.Ct. at 1249. This passage strongly suggests that taking analysis does not permit a property owner to divide up his property and evaluate the segments in isolation, regardless of the nature of the regulation. Indeed, later in the opinion, the Court observed that even if it accepted the property owner's position that underlying land could be analyzed separately, the claim would fail because the owner had "acquired or retained the support estate for a great deal of land, only part of which" was subject to the regulation. *Id.* at 1250–51. In short, the proper point of reference was *all* of the owner's property, not just the portion subject to the regulation.

Another reason to doubt *American Savings'* continued vitality is its failure to distinguish facial and as-applied challenges for purposes of final decision ripeness. Two years after the decision in *American Savings,* the Ninth Circuit explicitly held that failure to submit a development application does not bar a facial taking claim. *See Martino,* 703 F.2d at 1146–47. Yet the *American Savings* court precluded both the as-applied *and* the facial challenges on this ground. The court's reluctance to analyze segments of property separately without first requiring a development application indicates that even if such analysis is permissible, it should be done only in an as-applied challenge, since it requires a detailed examination of the property owner's unique circumstances.

This raises the second reason *American Savings* does not support Zilber's position. Even assuming *American Savings* remains good law, the holding in that case was that separate analysis of portions of the claimant's property is not appropriate until a development application has been submitted and processed. As already noted, Zilber has not submitted a meaningful development application.

Further, the reasons given in *American Savings* for declining to decide the "separate analysis" issue apply with equal force here. Like the statute there, MOSO provides for density transfers, alleviating to some extent the burden imposed by development proscription in certain areas.[9] This fact alone protects MOSO from facial attack under Zilber's theory, and until he pursues a development application, an as-applied claim is unripe.

In summary, MOSO is not a taking on its face because it permits beneficial uses of regulated land, at least in most areas. It is not subject to facial attack on the theory that portions of a landowner's property may be taken because (1) taking analysis requires consideration of the owner's property as a whole; and (2) even if permissible, such analysis would be appropriate only in an as-applied challenge.

### III. The "Temporary Taking" Claim

Zilber contends that the effects already produced by imposition of the moratorium and enactment of MOSO amount to a taking, regardless of what may occur in the future. In particular, he complains that these ordinances resulted in the developer's decision not to exercise its option to purchase the property. He styles this as a "temporary taking," distinct from his earlier claims for a "permanent taking."

In this Court's view, there is no significant distinction, for analytical purposes, between a "temporary" and a "permanent" taking. As the Supreme Court put it in *First English,* " 'temporary' takings ... are not different in kind from permanent takings...." 107 S.Ct. at 2388. In either case the issue is whether the regulation "goes too far" in burdening the landowner's property. While the *First English* Court reiterated that a regulation need not be indefinite to effect a taking, this rule is simply a recognition that taking determina-

---

**9.** Zilber contends that he cannot transfer density from areas where development is prohibited because he already has an abundance of "unusable density" from land where development is permitted but not possible. This argument is of dubious merit in the first place, but in any event is beyond the scope of a facial challenge.

tions are matters of degree.[10] Consequently, this Court will apply the same analysis to Zilber's "temporary" taking claim as it did to his "permanent" taking claim.

### A. MOSO as a "Temporary Taking"

For the same reasons explained in the discussion of Zilber's first two claims, the challenge to MOSO as a temporary taking must fail. With respect to any "as-applied" challenge, the failure to submit a meaningful development application makes the claim unripe.[11] With respect to a facial challenge, MOSO obviously does not constitute a "temporary" taking if, as the Court determined above, it is not a taking even if it is effective indefinitely.

### B. The Moratorium as a "Temporary Taking"

#### 1. *Ripeness*

The claim premised on the one-and-a-half-year moratorium is distinguishable from the claim based on MOSO for purposes of final decision ripeness. During that year and a half, submission of development plan would, as a practical matter, obviously be futile; the law by its very nature so provided. The only question is whether the case law permits such a conclusion as a legal matter. This Court is of the view that it does.

As the discussion above indicates, *Kinzli* may be read to preserve the futility exception to the extent that development application procedures are either unfair or unreasonably slow. From this rule it follows that pursuit of a development or variance application would be futile when there is no application procedure at all. The moratori-

um on development applications falls into this category and Zilber is therefore excused from failing to pursue an application during the period the moratorium was in effect. Accordingly, the claim premised on the moratorium is not barred by final decision ripeness. Additionally, for the same reasons advanced under the second claim, state remedies ripeness does not bar the claim.

#### 2. *The Merits*

In *First English*, the Supreme Court indicated that "normal delays in obtaining building permits, *changes in zoning ordinances*, variances and the like" do not rise to the level of a taking. 107 S.Ct. 2389 (emphasis added). Similarly, the Ninth Circuit in *Kinzli* noted that under *Williamson*, an eight year application process evidently does not qualify as "excessive delay" for purposes of ripeness. 818 F.2d at 1454 n. 5. Thus a one-and-a-half-year development moratorium in order to develop a comprehensive scheme for regulating open space seems neither unreasonable nor, standing alone, sufficiently burdensome to require compensation.

Zilber's contention that he lost a lucrative sale as a partial result of the moratorium does not change this result. His argument is akin to one rejected in *Agins*. The claimant there asserted that, by preventing the sale or development of his property, the government's abandoned attempt to condemn the property amounted to taking. The Court responded as follows:

> The State Supreme Court correctly rejected the contention that the municipality's good-faith planning activities, which did not result in successful prosecution of an eminent domain claim, so burdened

---

**10.** The actual holding in *First English* is not inconsistent with the notion that "temporary" taking analysis is no different from "permanent" taking analysis. The Court merely held "that where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." 107 S.Ct. at 2389. In other words, *First English* was concerned with the proper measure of compensation once a taking is established, not *the proper method of determining if* a taking has occurred.

**11.** Zilber appears to argue that final decision ripeness should not prevent a court from determining whether events that occurred prior to when a development application could be processed—such as the developer's decision not to exercise its option—amount to a taking. The answer to this argument is that a court will examine the merits of such a claim when it is ripe. After a the property owner pursues the requisite development application (and variance request), the court will entertain argument that a taking was already accomplished before final processing of the application.

the appellant's enjoyment of their property as to constitute a taking. Even if the appellants' ability to sell their property was limited during the pendency of the condemnation proceeding, the appellants were free to sell or develop their property when the proceedings ended. Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are "incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense." 447 U.S. at 263 n. 9, 100 S.Ct. at 2143 n. 9 (citations omitted).

In short, the moratorium was not so long as to constitute a taking on its face, and the loss of the sale is simply an "incident of ownership" and therefore does not render the moratorium a taking as-applied. Accordingly, this claim fails.

## IV. *The Inverse Condemnation Claim*

Zilber's complaint also includes a claim for inverse condemnation under California law. Since his only theory of entitlement to compensation seems to be a regulatory taking under the fifth amendment, and since this Court has already determined that this case, in its present posture, does not involve a taking, this claim also fails.

## V. *The Substantive Due Process Claim*

■ Although he did not explicitly plead such a claim in his complaint, Zilber asserts in his motion papers that his "taking claims also state a claim for violation of substantive due process rights." He cites *Lake Nacimiento* and *Williamson* for the proposition that a substantive due process claim in this context is "essentially the same as the taking claim." 841 F.2d at 879.

This Court need not determine whether the test for establishing a substantive due process claim is identical to that for establishing a taking claim, *see Herrington*, 834 F.2d at 1498 ("[t]aking claims and substantive due process claims are not fungible"), because the due process claim is barred by final decision ripeness. Although the precise ripeness requirements for substantive due process challenges to land use regulation are unclear, *see Barancik v. County of Marin*, —— F.2d —— (9th Cir.1988)

("law of the circuit appears to be presently in conflict" as to appropriate standard), even the most lenient standard requires the rejection of at least one meaningful development application, *see Herrington*, 834 F.2d at 1495 ("we conclude that the *Kinzli* final decision requirement is applicable to the Herringtons' substantive due process" claim). Since Zilber failed to obtain a status determination or to submit a development application, he does not meet this requirement and the substantive due process claim is therefore barred.

## CONCLUSION

The final decision ripeness requirement bars Zilber's as-applied challenge to MOSO. While this Court holds some reservations about the state of the law regarding the futility exception to the final decision requirement, it is nevertheless bound by Ninth Circuit precedent. In any event, this case presents a clear example of when the final decision requirement should apply, since Zilber failed completely to make use of a procedure that would provide an authoritative assessment of MOSO's impact upon his property.

The facial challenge, though not barred by ripeness, nevertheless fails because the language of MOSO does not deprive Zilber of all beneficial use of his property. Rather, it merely restricts that use and therefore does not constitute a taking.

The remaining claims fail for largely the same reasons as the first two claims. Either they are unripe—as is the case for substantive due process claim and the "temporary" taking claim against MOSO— or they lack the requisite showing of deprivation of all economically viable use—as is the case for the facial challenge to MOSO and the claim premised on the moratorium. Of course, the inverse condemnation claim collapses in the absence of a taking. Accordingly, the Town's motion for summary judgment is granted.

IT IS SO ORDERED.